UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY FORWARD FOUNDATION,

Plaintiff,

v.

OFFICE OF PERSONNEL MANAGEMENT, et al.,

Defendants.

Civil Action No. 25-0858 (SLS)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 2

I. Development and Interagency Review of ARRPs .......... 2

II. Plaintiff's FOIA Requests .......... 5

III. Scope of Challenged Withholdings .......... 7

STANDARD OF REVIEW .......... 7

ARGUMENT

I. Defendants Properly Withheld the ARRPs Under Exemption 5 .......... 8

A. The ARRPs Qualify for Protection Under Exemption 5 as Inter-Agency Materials Protected by the Deliberative Process Privilege .......... 9

B. Disclosure of the ARRPs Would Cause Reasonably Foreseeable Harm to the Interests Protected by the Deliberative Process Privilege .......... 13

C. Defendants Satisfied FOIA's Segregability Requirements .......... 17

II. OPM Properly Withheld Portions of the Communications Under Exemption 5 .......... 22

A. February 10, 2026 Production, Page 1 .......... 23

B. February 10, 2026 Production, Page 2 .......... 24

C. May 27, 2026 Production, Pages 17, 19, and 73–74 .......... 25

D. March 16, 2026 Production, Page 17 .......... 27

E. OPM Satisfied FOIA's Segregability Requirements .......... 29

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Cases** **Page**

*Abtew v. Dep't of Homeland Sec.*,
808 F.3d 895 (D.C. Cir. 2015) ........ 10

*Access Reports v. Dep't of Just.*,
926 F.2d 1192 (D.C. Cir. 1991) ........ 10, 11

*Am. Ctr. for Law & Just. v. Dep't of Just.*,
325 F. Supp. 3d 162 (D.D.C. 2018) ........ 18

*Am. Ctr. for Law & Just. v. Dep't of State*,
330 F. Supp. 3d 293 (D.D.C. 2018) ........ 17

*Am. First Legal Found. v. Dep't of Agric.*,
126 F.4th 691 (D.C. Cir. 2025) ........ 8

*Am. Oversight v. Dep't of Health & Hum. Servs.*,
101 F.4th 909 (D.C. Cir. 2024) ........ 9

*Ancient Coin Collectors Guild v. Dep't of State*,
641 F.3d 504 (D.C. Cir. 2011) ........ 20, 27

*Armstrong v. Exec. Off. of the President*,
97 F.3d 575 (D.C. Cir. 1996) ........ 18

*Brayton v. Off. of the U.S. Trade Representative*,
641 F.3d 521 (D.C. Cir. 2011) ........ 8

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
58 F.4th 1255 (D.C. Cir. 2023) ........ 8

*Cleveland v. Dep't of State*,
128 F. Supp. 3d 284 (D.D.C. 2015) ........ 10

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ........ 10, 13

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ........ 9, 10, 22

*Elec. Frontier Found. v. Dep't of Just.*,
739 F.3d 1 (D.C. Cir. 2014) ........ 18, 20

*Emuwa v. Dep't of Homeland Sec.*,
113 F.4th 1009 (D.C. Cir. 2024) .......... 15, 21, 22

*Farahi v. FBI*,
153 F.4th 1283 (D.C. Cir. 2025) .......... 18

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
71 F.4th 1051 (D.C. Cir. 2023) .......... 18, 19, 20

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) .......... 8

*Georgia v. Dep't of Just.*,
148 F.4th 724 (D.C. Cir. 2025) .......... 8

*Johnson v. Exec. Office for U.S. Attys.*,
310 F.3d 771 (D.C. Cir. 2002) .......... 17

*Juarez v. Dep't of Just.*,
518 F.3d 54 (D.C. Cir. 2008) .......... 18

*Jud. Watch, Inc. v. Dep't of Def.*,
245 F. Supp. 3d 19 (D.D.C. 2017) .......... 21

*Jud. Watch, Inc. v. Dep't of Def.*,
847 F.3d 735 (D.C. Cir. 2017) .......... 13

*Jud. Watch, Inc. v. Dep't of Just.*,
20 F. Supp. 3d 260 (D.D.C. 2014) .......... 17

*Jud. Watch, Inc. v. Dep't of Just.*,
821 F. Supp. 3d 20 (D.D.C. 2026) .......... 17, 22

*Jud. Watch, Inc. v. FDA*,
449 F.3d 141 (D.C. Cir. 2006) .......... 10

*Larson v. Dep't of State*,
565 F.3d 857 (D.C. Cir. 2009) .......... 8

*Leopold v. CIA*,
Civ. A. No. 22-0453 (DLF), 2026 U.S. Dist. LEXIS 67777 (D.D.C. Mar. 30, 2026) .......... 22

*Leopold v. United States*,
94 F.4th 33 (D.C. Cir. 2024) .......... 21, 22

*Levinthal v. Fed. Elec. Comm'n*,
219 F. Supp. 3d 1 (D.D.C. 2016) ........ 21

*Loving v. Dep't of Def.*,
550 F.3d 32 (D.C. Cir. 2008) ........ 17

*Machado Amadis v. Dep't of State*,
971 F.3d 364 (D.C. Cir. 2020) ........ 8, 13, 15, 17

*Mapother v. Dep't of Just.*,
3 F.3d 1533 (D.C. Cir. 1993) ........ 20, 27

*Mays v. DEA*,
234 F.3d 1324 (D.C. Cir. 2000) ........ 18

*Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Just. Exec. Office for U.S. Attys.*,
844 F.3d 246 (D.C. Cir. 2016) ........ 9

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ........ 9, 10, 13

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
402 F. Supp. 2d 211 (D.D.C. 2005) ........ 21

*Neufeld v. IRS*,
646 F.2d 661 (D.C. Cir. 1981) ........ 18

*Novak v. CIA*,
Civ. A. No. 23-2989 (TSC), 2026 U.S. Dist. LEXIS 23589 (D.D.C. Feb. 4, 2026) ........ 22

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
57 F.4th 1061 (D.C. Cir. 2023) ........ 20

*Porup v. CIA*,
997 F.3d 1224 (D.C. Cir. 2021) ........ 17

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ........ 9, 13, 14, 22

*Rosenberg v. Dep't of Def. ("Rosenberg I")*,
342 F. Supp. 3d 62 (D.D.C. 2018) ........ 14

*Rosenberg v. Dep't of Def. ("Rosenberg II")*,
442 F. Supp. 3d 240 (D.D.C. 2020) ........ 14

*Rudometkin v. United States*,
140 F.4th 480 (D.C. Cir. 2025) ... 21

*Russell v. Dep't of the Air Force*,
682 F.2d 1045 (D.C. Cir. 1982) ... 16

*Sack v. Dep't of Def.*,
823 F.3d 687 (D.C. Cir. 2016) ... 18

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ... 8

*Sarras v. Dep't of Just.*,
Civ. A. No. 19-0861 (CRC), 2024 U.S. Dist. LEXIS 167777 (D.D.C. Sept. 18, 2024) ... 19

*Spirko v. Postal Serv.*,
147 F.3d 992 (D.C. Cir. 1998) ... 18

*Sussman v. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ... 18, 19, 22

*U.S. Fish & Wildlife Serv. v. Sierra Club*,
592 U.S. 261 (2021) ... 9, 10, 11

*Viola v. Dep't of Just.*,
Civ. A. No. 16-1411 (TSC), 2025 U.S. Dist. LEXIS 110933 (D.D.C. June 11, 2025) ... 22

*Waterman v. IRS*,
61 F.4th 152 (D.C. Cir. 2023) ... 9

*Wolfe v. Dep't of Health & Human Serv.*,
839 F.2d 768 (D.C. Cir. 1988) (en banc) ... 20

**Statutes, Regulations, Rules, and Other Authorities**

5 U.S.C. § 552 ... 8, 9, 17, 21

Fed. R. Civ. P. 56 ... 7

By and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), Defendants Office of Personnel Management ("OPM") and Office of Management and Budget ("OMB") respectfully move for summary judgment in their favor in this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

**INTRODUCTION**

This action concerns records generated during a government-wide effort to evaluate potential workforce reductions and agency reorganizations. In February 2025, the President directed agencies to consider whether components should be eliminated or consolidated, and Defendants thereafter established a two-phase process for developing and submitting Agency Reduction-in-Force and Reorganization Plans ("ARRPs"). Phase 1 ARRPs provided Defendants with agencies' preliminary assessments, proposed approaches, and supporting considerations for review and discussion. The process was designed to facilitate interagency deliberation—not to produce final, OPM- or OMB-approved plans that agencies were bound to implement.

Plaintiff submitted FOIA requests to both OPM and OMB seeking the Phase 1 ARRPs, and separately submitted a request to OPM seeking communications concerning the development, approval, and implementation of those plans and related guidance. The dispute is now narrow. Plaintiff challenges OPM's and OMB's withholding of approximately 147 Phase 1 ARRPs, as well as six discrete withholdings in OPM communications, all under Exemption 5's deliberative process privilege. Those OPM communications include exchanges concerning proposed workforce tools, agency restructuring proposals, the development of OPM guidance, and an interim spreadsheet used by OPM and OMB personnel to review submitted ARRPs.

Defendants properly withheld that material. The Phase 1 ARRPs are quintessential predecisional and deliberative records: they contain agencies' preliminary recommendations, assessments, alternatives, and proposed courses of action, and were created to facilitate an ongoing

process of review, feedback, and decisionmaking among the submitting agencies, OPM, and OMB. Disclosure would also foreseeably impair that process by chilling the candid exchange of views concerning sensitive workforce, organizational, budgetary, and legal issues and by exposing tentative proposals and assumptions that could readily be mistaken for final agency or Administration decisions. OPM has made the same showing as to the six remaining communication withholdings, establishing that each protects preliminary, deliberative exchanges whose disclosure would cause the same kinds of concrete harm.

Finally, Defendants have satisfied FOIA's segregability requirements. OPM conducted line-by-line reviews of both the ARRPs and the challenged communications and determined that no nonexempt information could reasonably be segregated from the protected deliberative material and that no reasonably segregable exempt portion could be released without causing foreseeable harm. The Court should therefore grant summary judgment to Defendants.

## BACKGROUND

### I. <u>Development and Interagency Review of ARRPs.</u>

On February 11, 2025, the President issued Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*. *See* Defendants' Statement of Undisputed Material Facts ("SUMF"), ¶ 1. The Executive Order called for a "critical transformation" of the Government to reduce "waste" and "insularity" and directed agencies to submit to OMB a report "discuss[ing] whether the agency or any of its subcomponents should be eliminated or consolidated." *See id.* ¶ 2. Recognizing that changes at one agency could affect the missions of other agencies and the Administration's broader policy objectives, the Director of OMB and the Acting Director of OPM jointly issued a Memorandum on February 26, 2025, providing for interagency coordination of agencies' reorganization efforts in furtherance of the "critical transformation" called for by Executive Order 14210. *See id.* ¶ 3.

The Memorandum established a two-phase planning process. *See* SUMF ¶ 4. In Phase 1, each agency was instructed to prepare an Agency Reduction-in-Force and Reorganization Plan ("ARRP") setting out the agency's views on whether "the agency or any of its subcomponents should be eliminated or consolidated," and "which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities." *See id.* ¶ 5. To support those views, each agency was asked to lay out relevant considerations, such as the extent of the agency's understanding of its legal obligations and the level of resources required, from the agency's perspective, to fulfill those obligations. *See id.* ¶ 6. The Memorandum also asked agencies about their intent to use various "specific tools," such as hiring freezes, regular attrition, or reductions in force ("RIFs"). *See id.* ¶ 7. Agencies were directed to structure these Phase 1 submissions around the Administration's broader workforce-reduction and reorganization objectives so that OPM and OMB could evaluate whether each agency's proposed approach aligned with those objectives. *See id.* ¶ 8. Phase 1 ARRPs were due to OPM and OMB by March 13, 2025. *See id.* ¶ 9.

Phase 2 required agencies to provide a more developed account of their future operations, including their "vision for more productive, efficient agency operations going forward." *See* SUMF ¶ 10. That submission was to reflect the agency's position on how its functions and resources could be restructured to reduce costs, enhance accountability, improve mission delivery, and align with the President's policy priorities. *See id.* ¶ 11. Agencies were asked to describe how they might achieve such a restructuring, and along what timeline. *See id.* ¶ 12. Phase 2 ARRPs were due to OPM and OMB by April 14, 2025. *See id.* ¶ 13.

Submission of the Phase 1 and 2 ARRPs to OPM and OMB enabled essential interagency deliberations over the composition, structure and focus of Executive Branch agencies, with the goal of achieving the "critical transformation" called for by the President. *See id.* ¶ 14; *see also*

*id*. ¶¶ 15–23, 40–52. These deliberations included cross-agency deconfliction and coordination to ensure a unified and cohesive government-wide approach. *See id*. ¶ 15.

For its part, OMB reviewed agencies' submissions to gauge to what extent agencies' positions aligned with statutory requirements, existing funding availability, tentative plans for future budgets, and the President's policy positions and agenda. *See* SUMF ¶ 16. Where OMB had questions about an agency's ideas, OMB officials or staff conferred with counterparts at the agency to ensure that any policy disagreements were identified and elevated as appropriate. *See id*. ¶ 17.

Meanwhile, OPM reviewed agencies' submissions with particular attention to their proposed use of workforce tools—such as hiring freezes, attrition, early retirement and separation incentives, and RIFs—to assess whether those proposals complied with the President's policy positions and agenda, applicable civil service laws and regulations, and applicable OPM guidance, and to identify where agencies would require guidance or technical assistance from OPM to carry out their proposals. *See* SUMF ¶ 18. Where OPM identified questions or concerns regarding an agency's proposed approach, OPM officials or staff likewise conferred with counterparts at the submitting agency. *See id*. ¶ 19.

The ARRP development and submission process was intended neither to yield a set of marching orders nor to produce a final agency plan—that is, an OPM- and OMB-approved ARRP that the agency head would be committed to carry out. *See* SUMF ¶ 20. Instead, the process was designed to give OPM and OMB a preliminary view of how each agency proposed to approach reorganization and an opportunity to assess whether that approach might align—or not—with the Administration's broader workforce-reduction and reorganization objectives. *See id*. ¶ 21.

In sum, Phase 1 ARRPs served as early diagnostic and planning documents, giving OPM and OMB an initial view of each agency's proposed direction, priorities, and methods and allowing

them to identify areas of agreement, concern, or potential conflict. That foundational work would allow for easier adjustments in the inevitable event that agencies' initial plans changed over time, including during the development of Phase 2 ARRPs, which required agencies to articulate plans addressing future-state organization, additional RIFs, real estate changes, and implementation details. *See* SUMF ¶¶ 22–23.

## II. Plaintiff's FOIA Requests.

On March 12, 2025, Plaintiff submitted three FOIA requests relevant here: one to OMB, which OMB acknowledged on March 25, 2025, and assigned tracking number 2025-1131, and two to OPM, which OPM acknowledged on April 1, 2025, and assigned tracking numbers 25-OPM-1201-F and 25-OPM-1202-F, respectively. *See* SUMF ¶ 24.

The request to OMB bearing tracking number 2025-1131 sought, for the period beginning February 1, 2025, "[a]ll Agency RIF and Reorganization Plans ('ARRPs') submitted to OMB . . . by heads and acting heads of departments and agencies as required by" the February 26, 2025 Memorandum. *See* SUMF ¶ 25. On July 30, 2025, OMB communicated its final determination to Plaintiff that, except for one ARRP that had been released as part of the administrative record in another matter, all other ARRPs were predecisional and deliberative and were therefore being withheld in full pursuant to Exemption 5. *See id.* ¶ 26.

The request to OPM bearing tracking number 25-OPM-1201-F likewise sought, for the period beginning February 1, 2025, "[a]ll Agency RIF and Reorganization Plans ('ARRPs') submitted to OPM . . . by heads and acting heads of departments and agencies as required by" the February 26, 2025 Memorandum. *See* SUMF ¶ 27. On September 2, 2025, OPM communicated its final determination to Plaintiff that all ARRPs were being withheld in full pursuant to Exemption 5. *See id.* ¶ 28.

The request to OPM bearing tracking number 25-OPM-1202-F sought records for the period beginning January 20, 2025, and contained two subparts. *See* SUMF ¶ 29. Subpart 1 sought: "All electronic communications (including emails, email attachments, complete email chains, calendar invitations, calendar invitation attachments, text messages, or messages on messaging platforms) of Acting Director Ezell, Chief of Staff Amanda Scales, Senior Advisor Brian Bjelde, Senior Advisor Riccardo Biasini, and/or Senior Advisor Noah Peters, regarding the development, approval, and implementation of ARRPs, including directives and guidance sent to other agencies." *See id.* ¶ 30. In response, OPM made six productions: August 29, 2025 (11 pages withheld in part pursuant to Exemptions 5 and 6); January 8, 2026 (38 pages withheld in part pursuant to Exemptions 5 and 6); a separate production on January 8, 2026 (1 page withheld in part pursuant to Exemption 5); February 10, 2026 (5 pages withheld in part pursuant to Exemptions 5 and 6); March 16, 2026 (3 pages withheld in part pursuant to Exemptions 5 and 6); and May 27, 2026 (79 pages withheld in part pursuant to Exemptions 5 and 6). *See id.* ¶ 31.

Subpart 2 sought: "All electronic communications (including emails, email attachments, complete email chains, calendar invitations, calendar invitation attachments, text messages, or messages on messaging platforms) between (1) any OPM officials listed below (or otherwise affiliated with) the Department of Government Efficiency ('DOGE') (also known as the U.S. 'DOGE' (previously 'Digital') Service), and (2) Elon Musk, or any representatives of Elon Musk or DOGE, or any representatives of the Executive Office of the President (including, but not limited to, emails ending in eop.gov). [list of twenty-six specified officials omitted]." *See* SUMF ¶ 32. On July 30, 2025, Plaintiff agreed to reduce the number of custodians in Subpart 2 from twenty-six to nine and to defer processing of email attachments. *See id.* ¶ 33. In response, OPM

made its first and final production on March 16, 2026, producing 64 pages withheld in part pursuant to Exemptions 5 and 6. *See id.* ¶ 34.

### III. <u>Scope of Challenged Withholdings.</u>

On June 1, 2026, Plaintiff provided OPM and OMB with a list identifying the withholdings it intended to challenge, limited to those asserted under Exemption 5. *See* SUMF ¶ 35. For the request to OMB and the request to OPM bearing tracking number 25-OPM-1201-F, Plaintiff indicated that it would challenge the withholding in full of all ARRPs. *See id.* ¶ 36.[1]

For the request to OPM bearing tracking number 25-OPM-1202-F, Plaintiff identified eleven communication withholdings that it intended to challenge—ten pertaining to Subpart 1 and one pertaining to Subpart 2. *See* SUMF ¶ 37. Thereafter, OPM clarified the scope of those challenges without changing the total number at issue and then determined that five did not meet the standard for withholding under Exemption 5 and should be released. *See id.* ¶ 78. Accordingly, six communication withholdings remain at issue—five under Subpart 1, concerning records produced on February 10, 2026 (pages 1 and 2) and May 27, 2026 (pages 17, 19, and 73–74), and one under Subpart 2, concerning a record produced on March 16, 2026 (page 17). *See id.* ¶ 79.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade*

---

[1] Plaintiff alleges that it submitted these requests "close to the time at which agencies were required to submit their plans to ensure that Defendants' search cut-off dates for responsive records would include all plans submitted through March 13, 2025." Am. Compl. ¶ 19 n.7, ECF No. 22. That date was the deadline for Phase 1 ARRPs; Phase 2 ARRPs were not due until April 14, 2025, and thus did not yet exist when Plaintiff submitted its requests. *See* SUMF ¶¶ 9, 13. The requests therefore appear to have been directed to the Phase 1 ARRPs due on March 13. This motion proceeds from that understanding. *See* Harris Decl. ¶ 24.

*Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011) (cleaned up). "The agency bears the burden to justify nondisclosure under any exemption it asserts and ordinarily may carry that burden by submitting declarations 'attesting to the basis for the agency's decision.'" *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023) (citations omitted). An agency's declarations "are accorded a presumption of good faith." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Summary judgment that a FOIA exemption applies is warranted when the agency's declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Am. First Legal Found. v. Dep't of Agric.*, 126 F.4th 691, 694–95 (D.C. Cir. 2025) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## ARGUMENT

### I. <u>Defendants Properly Withheld the ARRPs Under Exemption 5.</u>

"FOIA expressly recognizes that important interests are served by its exemptions and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Georgia v. Dep't of Just.*, 148 F.4th 724, 732 (D.C. Cir. 2025) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019)). Consistent with that statutory balance, an agency seeking to withhold a responsive record must establish that the record is covered by one of nine exemptions listed in 5 U.S.C. § 552(b) and that it "reasonably foresees that disclosure would harm an interest protected by [the] exemption." *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (alterations in original; quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). Applying those principles here, Defendants have established the requirements for withholding the ARRPs and have also satisfied FOIA's segregability obligation: the ARRPs fall within Exemption 5, their disclosure would cause reasonably foreseeable harm to the interests protected by that

exemption, no nonexempt information can reasonably be segregated from exempt material, and no exempt portion can be released without causing foreseeable harm. Accordingly, Defendants are entitled to summary judgment as to the withheld ARRPs.

### A. The ARRPs Qualify for Protection Under Exemption 5 as Inter-Agency Materials Protected by the Deliberative Process Privilege.

Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As a threshold matter, the records must have as their "source" either an "agency" as defined in 5 U.S.C. §§ 551(1) and 552(f), or a disinterested consultant advising such an agency "just as an employee [of the agency] would be expected to do." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–11 (2001); *see also Am. Oversight v. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 916–17 (D.C. Cir. 2024).

The records must also qualify as "records that would normally be privileged in the civil discovery context." *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Just. Exec. Office for U.S. Attys.*, 844 F.3d 246, 249 (D.C. Cir. 2016) (quoting *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)). Exemption 5 incorporates the deliberative process privilege, "which protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'" *Waterman v. IRS*, 61 F.4th 152, 156 (D.C. Cir. 2023) (quoting *Sears*, 421 U.S. at 150).

To be protected by the deliberative process privilege, the document must be "both predecisional and deliberative." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021). A document "is predecisional if it was 'generated before the agency's final decision on the matter.'" *Id.* (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club*, 592 U.S. 261, 268 (2021)). A document "is deliberative when it is 'prepared to help the agency formulate its

position,' and it 'reflects the give-and-take of the consultative process.'" *Id*. (quoting *Sierra Club*, 592 U.S. at 268; *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006)). "Examples of predecisional documents include 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Cleveland v. Dep't of State*, 128 F. Supp. 3d 284, 298–99 (D.D.C. 2015) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)); *see also Abtew v. Dep't of Homeland Sec.*, 808 F.3d 895, 898–99 (D.C. Cir. 2015) (holding that a subordinate's recommendation to a supervisor on a matter pending before the latter is both predecisional and deliberative). And although deliberations need not have ripened into a final decision, the agency must identify the larger decisionmaking process to which the document contributed. *See Sears*, 421 U.S. at 151 n.18; *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1196–97 (D.C. Cir. 1991).

Here, the ARRPs qualify as inter-agency memoranda and thus easily satisfy the threshold Exemption 5 requirement. OPM and OMB received approximately 147 Phase 1 ARRPs from both small and large federal agencies, commissions, and boards. *See* SUMF ¶ 38. The submitting agencies are listed in Exhibit 2 attached to the Declaration of Lance Harris. Each qualifies as an "agency" as defined in 5 U.S.C. §§ 551(1) and 552(f). *See Klamath*, 532 U.S. at 9. Because each ARRP was prepared by one federal agency and transmitted to two others—OPM and OMB—as part of a mandated interagency review process, the ARRPs fall comfortably within Exemption 5's threshold. *See* SUMF ¶¶ 5, 9, 38

Next, the ARRPs were "predecisional." They reflected the submitting agencies' initial assessments and preliminary views concerning potential workforce reductions, organizational changes, and resource allocation, and were prepared and submitted before the agencies reached

final decisions concerning those matters. *See* SUMF ¶ 40. In fact, several agencies expressly noted that their proposals were subject to change or not yet fully formulated. *See id.* ¶ 41.

OPM and OMB likewise did not treat proposals contained in the ARRPs as commitments or firm decisions by the submitting agency to carry out any particular workforce change. *See* SUMF ¶ 42. The ARRPs contained proposed courses of action, including recommendations concerning staffing levels, consolidation of functions, organizational structure, and reductions in force, based in part on assumptions and projections concerning resource availability, appropriations, and policy priorities. *See id.* ¶ 43. Because those assumptions and projections could change, the proposals based upon them could change as well. *See id.* ¶ 44. In fact, several actions proposed in the Phase 1 ARRPs, including large-scale reductions in force, required additional preparation, legal review, possible congressional notification, and other implementing steps before they could be carried out, leaving the proposals subject to revision as the planning process continued. *See id.* ¶ 45. Thus, the ARRPs did not constitute a final decision or policy of OPM or OMB, and neither agency adopted any withheld ARRP, in whole or in part, as its own final position or incorporated it by reference into a final decision. *See id.* ¶ 46.

Moreover, the predecisional nature of the ARRPs does not depend on whether Defendants can "'pinpoint' a later decision to which the document[s] contributed," as that would "defeat the purpose" of the privilege altogether. *Access Reports*, 926 F.2d at 1193, 1196; *see also Sierra Club*, 592 U.S. at 269 ("Sometimes a proposal dies on the vine. That happens in deliberations—some ideas are discarded or simply languish. Yet documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course."). To carry their burden, Defendants need only identify "the decisionmaking process to which [the ARRPs] contributed." *Access Reports*, 926 F.2d at 1196. Defendants easily satisfy that standard. The record shows that the Phase 1

ARRPs formed part of a two-phase interagency planning process through which agencies developed proposed approaches to reorganization, OPM and OMB evaluated those proposals against broader Administration objectives, and the agencies then refined their plans through further review, coordination, and feedback. *See* SUMF ¶¶ 4–23. That is more than sufficient to identify the decisionmaking process to which the withheld ARRPs contributed.

Further, the ARRPs were "deliberative." Although the specific contents of individual ARRPs varied according to the mission and structure of the submitting agency, they shared several common characteristics. *See* SUMF ¶ 47. For example, they contained recommendations, evaluations, proposed options, subjective analysis, and policy and organizational alternatives concerning such matters as staffing levels, organizational structure, resource allocation, consolidation of functions, and potential workforce reductions. *See id.* ¶ 48. They also reflected evaluative judgments about which functions or positions might be non-essential or duplicative and proposed approaches for carrying out reorganizations and reductions in force. *See id.* ¶ 49.

Those recommendations, evaluations, and proposed alternatives were prepared specifically to facilitate discussion and decisionmaking among agency leadership, OPM, OMB, budget personnel, and policy officials by helping those participants formulate their positions concerning an agency's composition, structure, priorities, staffing, and funding. *See* SUMF ¶ 50. The submissions also served as a basis for further review, discussion, and feedback among the relevant officials, and agencies could revise their proposals as that process unfolded. *See id.* ¶ 51. The fact that some agencies submitted more than one version of a Phase 1 ARRP further reflected the iterative nature of the development and review process and the potential for agencies' proposals to evolve through further analysis and discussion. *See id.* ¶ 52.

In both name and substance, then, the ARRPs are plans—proposals submitted for review, feedback, and refinement, not statements of settled agency policy. Thus, the withheld ARRPs qualify for protection under Exemption 5 as inter-agency materials protected by the deliberative process privilege.

### B. Disclosure of the ARRPs Would Cause Reasonably Foreseeable Harm to the Interests Protected by the Deliberative Process Privilege.

After establishing that the record is privileged, the agency must show that it reasonably foresees that disclosure "would harm an interest protected by the deliberative-process privilege." *Machado Amadis*, 971 F.3d at 371; *see* 5 U.S.C. § 552(a)(8)(A)(i)(I). The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017). Beyond encouraging candor, the privilege also protects policymakers from "premature disclosure of their proposals before they have been completed or adopted" and guards against "confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Reps. Comm.*, 3 F.4th at 361 (quoting *Coastal States*, 617 F.2d at 866). "All of this is in service of the same goal, which is to 'prevent injury to the quality of agency decisions.'" *Id*. (quoting *Sears*, 421 U.S. at 151).

Accordingly, to satisfy its burden, the agency must "concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm.*, 3 F.4th at 369–70. A "perfunctory" statement about the harm to internal deliberations "will not suffice." *Id*. at 370. "Instead, what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually

impede those same agency deliberations going forward." *Id.*; *see also Rosenberg v. Dep't of Def. ("Rosenberg II")*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020) (requiring agency to "identify specific harms to the relevant protected interests" and "connect the harms in a meaningful way to the information withheld"). An agency may satisfy this burden "on a category-by-category basis rather than a document-by-document basis—'that is, group together like records' and explain the harm that would result from release of each group," so long as "the basis and likelihood of that harm [is] independently demonstrated for each category." *Reps. Comm.*, 3 F.4th at 369 (quoting *Rosenberg v. Dep't of Def. ("Rosenberg I")*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)).

Here, disclosure of the ARRPs would impair internal deliberations over the composition, structure and focus of Executive Branch agencies and thus cause reasonably foreseeable harm to the quality of any resulting decisions relating to the Administration's broader workforce-reduction and reorganization objectives. Disclosure of the Phase 1 ARRPs would reveal an agency's proposals, projections, estimates, and recommendations regarding matters that remained undetermined at the time the plans were prepared. *See* SUMF ¶ 53. Disclosure of those ARRPs would also reveal how agencies internally evaluated future workforce needs and expose assumptions underlying proposed recommendations, including legal assessments, policy considerations, and resource allocations. *See id.* ¶ 54.

Public disclosure of these preliminary assessments would predictably alter the manner in which agency officials participate in similar deliberations. *See* SUMF ¶ 55. Because the recommendations concern matters that directly affect agency components, employees, unions, contractors, congressional stakeholders, and program beneficiaries, officials would reasonably expect disclosed proposals to generate immediate scrutiny, opposition, or pressure directed at particular options and at the officials who proposed or evaluated them. *See id.* ¶ 56. In response,

agencies would be likely to temper their assessments, avoid identifying particularly sensitive deficiencies or unpopular alternatives, omit options that might provoke controversy, or frame their recommendations for an outside audience rather than provide OPM and OMB with their most candid assessment of the agency's needs and available choices. *See id.* ¶ 57. Thus, releasing the ARRPs "'would' chill future internal discussions." *Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1013 (D.C. Cir. 2024) (quoting *Machado Amadis*, 971 F.3d at 371).

That chilling effect would impair the decisionmaking process in concrete ways. *See* SUMF ¶ 58. OPM and OMB depend on agencies to provide complete and forthright information regarding operational needs, resource constraints, legal considerations, workforce consequences, and the advantages and disadvantages of competing approaches, especially when considering how changes at one agency may impact the mission of another, and advance or impede the President's broader policy agenda. *See id.* ¶ 59. If agencies provide only guarded or incomplete assessments, OPM and OMB will be less able to test the agencies' assumptions, identify weaknesses in their proposals, compare alternatives, reconcile competing priorities, and formulate coherent recommendations. *See id.* ¶ 60. OPM and OMB would likewise be less candid in their assessment, questions, and proposed revisions if their preliminary reactions could be publicly disclosed and attributed to them. *See id.* ¶ 61.

Disclosure would also risk portraying tentative proposals, assumptions or alternatives as final agency or Administration decisions. *See* SUMF ¶ 62. That misunderstanding could generate departures of agency personnel (including personnel whose positions would not eventually be eliminated), operational disruption, lobbying, litigation, and other external pressures while the proposals remain under consideration. *See id.* ¶ 63. Those reactions could constrain the available options and distort the process before decisionmakers have completed their review. *See id.* ¶ 64.

Disclosure therefore would not merely reveal a past deliberation; it would foreseeably reduce the completeness and candor of comparable agency submissions and interagency exchanges going forward, depriving decisionmakers of the frank analysis necessary to make informed and effective organizational, workforce, and budgetary decisions. *See id.* ¶ 65. The scale of the process magnifies these harms: the withheld records comprise approximately 147 plans spanning nearly the entire Executive Branch, and a ruling compelling their disclosure would signal to every federal agency that its most sensitive internal restructuring proposals may be laid bare while still under review. *See id.* ¶ 38.

The foreseeable harms associated with disclosure of the ARRPs are particularly significant here because those documents concern issues that are among the most sensitive and consequential matters of an agency. *See* SUMF ¶ 66. The records contain recommendations regarding organizational restructuring, workforce management, allocation of resources, statutory responsibilities, and budget planning. *See id.* ¶ 67. Effective decision-making in these areas depends on the ability of agency personnel to communicate candidly, evaluate alternatives thoroughly, identify weaknesses, and propose innovative or controversial solutions without concern that preliminary discussions will later be disclosed. *See id.* ¶ 68. Nor do these harms dissipate as individual reorganization decisions are announced or implemented: disclosure would still expose the options, assessments, and assumptions that agencies weighed but did not adopt, and would still teach future participants in government-wide planning exercises that their candid submissions may be laid bare. Officials "should be judged by what they decided, not for matters they considered before making up their minds." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

In sum, disclosure of the ARRPs would have a chilling effect on the frank and candid exchange between OMB, OPM, and the submitting agencies, causing foreseeable harm to the integrity, effectiveness, and quality of the Executive's decisionmaking process. *See* SUMF ¶ 69.

**C. Defendants Satisfied FOIA's Segregability Requirements.**

FOIA's segregability requirement encompasses two inquiries: whether any nonexempt information can reasonably be segregated and released, and whether any reasonably segregable exempt information can nevertheless be released without causing foreseeable harm. *See Jud. Watch, Inc. v. Dep't of Just.*, 821 F. Supp. 3d 20, 30 (D.D.C. 2026). Defendants satisfy both.

1. No Reasonably Segregable Nonexempt Information Can Be Released.

At the first stage of the segregability inquiry, the agency must demonstrate that it has segregated and released all non-exempt information. *See* 5 U.S.C. §§ 552(a)(8)(A)(ii)(II), 552(b); *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008). To do so, "the agency must provide a detailed justification for its non-segregability." *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted). "However, the agency is not required to provide so much detail that the exempt material would be effectively disclosed." *Id.*

Agencies "typically" make this showing by submitting a *Vaughn* index and "a declaration attesting that the agency released all segregable material." *Am. Ctr. for Law & Just. v. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018) (quoting *Jud. Watch, Inc. v. Dep't of Just.*, 20 F. Supp. 3d 260, 277 (D.D.C. 2014)). A sufficiently detailed declaration may itself suffice, however, including one explaining that the agency conducted a "page-by-page and line-by-line review," released "all reasonably segregable, non-exempt information," and determined that no additional information could be released without revealing exempt information. *Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021); *see also Machado Amadis*, 971 F.3d at 371–72 (holding that the agency's "line-by-line review" of documents was sufficient and "ensured that the redactions were

no broader than necessary to protect materials covered by the deliberative-process privilege"); *Spirko v. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998) (explaining that affidavits providing similar information as a *Vaughn* index "can suffice").

An agency may also withhold documents in their entirety where all information in the documents is exempt and, as a result, no portion is reasonably segregable. *See Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 13 (D.C. Cir. 2014). The agency may likewise withhold documents in their entirety "when nonexempt portions 'are inextricably intertwined with exempt portions.'" *Farahi v. FBI*, 153 F.4th 1283, 1286 (D.C. Cir. 2025) (quoting *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008)). Nonexempt and exempt material are "inextricably intertwined" where excision of the exempt material "would impose significant costs on the agency and produce an edited document with little informational value." *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (quoting *Neufeld v. IRS*, 646 F.2d 661, 666 (D.C. Cir. 1981)). In either circumstance, a court may rely on agency declarations establishing that the withheld documents contain no reasonably segregable information or explaining with reasonable specificity why they cannot be further segregated. *See Sack v. Dep't of Def.*, 823 F.3d 687, 695 (D.C. Cir. 2016); *Juarez*, 518 F.3d at 61; *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

Once an agency adequately demonstrates that it has released all reasonably segregable nonexempt information, that a withheld document contains no nonexempt information because it is exempt in its entirety, or that any nonexempt information is inextricably intertwined with exempt material, it is "entitled to a presumption that it complied with the obligation to disclose reasonably segregable material." *Flyers Rts. Educ. Fund, Inc. v. FAA*, 71 F.4th 1051, 1057–58 (D.C. Cir. 2023) (cleaned up; quoting *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)); *see Am. Ctr. for Law & Just. v. Dep't of Just.*, 325 F. Supp. 3d 162, 174–76 (D.D.C. 2018)

(applying presumption where agency declarations attested that it "conducted a line-by-line review of each document and released all segregable information" and explained that, for records withheld in full, nonexempt information was inextricably intertwined with exempt material); *Sarras v. Dep't of Just.*, Civ. A. No. 19-0861 (CRC), 2024 U.S. Dist. LEXIS 167777, at *21–22 (D.D.C. Sept. 18, 2024) (applying presumption where agency explained, among other things, that a record withheld in full contained no non-exempt information). To rebut this presumption, "the requester must offer, at least, evidence that would warrant a belief by a reasonable person that the agency failed to comply with its obligation." *Flyers Rts.*, 71 F.4th at 1058 (cleaned up). If the requester does so, "the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." *Sussman*, 494 F.3d at 1117.

Here, Defendants have sufficiently established that no portion of the Phase 1 ARRPs is reasonably segregable and releasable. OPM conducted a line-by-line review of all the Phase 1 ARRPs to assess whether any reasonably segregable, non-exempt information could be released, including whether factual material could be meaningfully separated from deliberative content. *See* SUMF ¶ 70. OPM determined that factual material contained in the Phase 1 ARRPs could not be separated from the deliberative process because the agencies' selection, organization, emphasis, and presentation of those facts themselves reflected evaluative judgments about the matters under consideration. *See id.* ¶ 71. For example, the decision to include particular staffing data, resource information, organizational characteristics, or historical facts—and the manner in which those facts were presented—would reveal what the submitting agency considered significant in developing its proposed approach to reorganization. *See id.* ¶ 72. In those circumstances, disclosure of the factual material would reveal aspects of the agency's deliberative analysis rather than disclose purely factual information standing apart from that analysis. *See id.* ¶ 73.

These justifications find ample support in the case law. *See*, *e.g.*, *Elec. Frontier Found.*, 739 F.3d at 4, 13 (recognizing that factual material may itself be privileged where disclosure "would so expose the deliberative process," and concluding that there was no reasonably segregable material because the "entire [record was] exempt from disclosure under the deliberative process privilege") (quoting *Wolfe v. Dep't of Health & Human Serv.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)); *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (recognizing that factual material may be deliberative where it reflects "an exercise of discretion and judgment calls," including through "the selection or organization of facts"); *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (holding factual material deliberative where it was "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents" for use in discretionary decisionmaking).

Further, even to the extent any factual or other information in the ARRPs could be considered non-exempt, OPM determined that such information was inextricably intertwined with recommendations, evaluations, and other deliberative material. *See* SUMF ¶ 74. Segregating that information would require extensive line-by-line redactions and would impose significant costs on the agencies, while leaving ARRPs consisting largely of isolated words, phrases, data points, or fragments whose meaning and significance derive largely from the surrounding deliberative context and which, standing alone, would have little informational value. *See id.* ¶ 75.

This justification also finds ample support in the case law. *See*, *e.g.*, *Flyers Rts.*, 71 F.4th at 1057–58 (holding that agency carried its segregability burden by establishing that further tailoring of the redactions would disclose only "partial sentences or single sentences" that were "entirely meaningless" without the surrounding exempt information); *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1069 (D.C. Cir. 2023) (affirming whole-

document withholding where agency declaration stated that unredacted portions had "minimal or no information content"); *Jud. Watch, Inc. v. Dep't of Def.*, 245 F. Supp. 3d 19, 37 (D.D.C. 2017) (holding agency satisfied its segregability burden where its declarants described a "document-by-document and line-by-line review" and explained that any "arguably non-deliberative" factual material was "inextricably intertwined" with deliberative portions of the withheld memoranda); *Levinthal v. Fed. Elec. Comm'n*, 219 F. Supp. 3d 1, 9–10 (D.D.C. 2016) (granting summary judgment where agency "conducted a line-by-line analysis" of the withheld report and established that its "factual portions" were "'inextricably intertwined' with its deliberative elements"); *Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (granting summary judgment where agency reviewed record "on a line-by-line basis" and stated in a declaration that non-exempt information was "so inextricably intertwined with the exempt information that release of the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words").

2. No Reasonably Segregable Exempt Information Could Be Released <u>Without Causing Foreseeable Harm.</u>

The segregability inquiry does not end there. The agency must also show that it "cannot release any reasonably segregable information from within exempt portions of the records without causing foreseeable harm." *Rudometkin v. United States*, 140 F.4th 480, 494 (D.C. Cir. 2025); *see* 5 U.S.C. §§ 552(a)(8)(A)(i)(I), (ii), 552(b); *Leopold v. United States*, 94 F.4th 33, 37 (D.C. Cir. 2024). This requires "independent consideration of whether any portion of a document, although exempt, could be segregated and released without causing foreseeable harm." *Rudometkin*, 140 F.4th at 495; *see also Emuwa*, 113 F.4th at 1017 (finding that agency conducted the appropriate analysis where it reviewed the redactions to consider "whether any information could be segregated and released without causing a foreseeable harm to the agency"). Here, too, agencies

are "entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Leopold v. CIA*, Civ. A. No. 22-0453 (DLF), 2026 U.S. Dist. LEXIS 67777, at *33–34 (D.D.C. Mar. 30, 2026) (quoting *Sussman*, 494 F.3d at 1117).

In this case, OPM also conducted a line-by-line review of all the Phase 1 ARRPs to assess whether any reasonably segregable exempt portions of those documents could be segregated and released without causing foreseeable harm. *See* SUMF ¶ 76. OPM determined that no reasonably segregable portion of the exempt information could be released without causing the foreseeable harms described above, because even partial disclosure of that information would reveal tentative recommendations, evaluative judgments, proposed courses of action, or other aspects of the agencies' privileged internal deliberations. *See id*. ¶ 77. This representation is sufficient. *See Emuwa*, 113 F.4th at 1017; *Leopold*, 2026 U.S. Dist. LEXIS 67777, at *34; *Novak v. CIA*, Civ. A. No. 23-2989 (TSC), 2026 U.S. Dist. LEXIS 23589, at *15 (D.D.C. Feb. 4, 2026); *Jud. Watch, Inc.*, 821 F. Supp. 3d at 30; *Viola v. Dep't of Just.*, Civ. A. No. 16-1411 (TSC), 2025 U.S. Dist. LEXIS 110933, at *31 (D.D.C. June 11, 2025).

Because no nonexempt information can reasonably be segregated from exempt material, and no exempt portion can be released without causing foreseeable harm, Defendants are entitled to summary judgment as to the ARRPs withheld in full.

## II. OPM Properly Withheld Portions of the Communications Under Exemption 5.

Plaintiff also challenges six withholdings in OPM communications concerning the development and review of agencies' workforce-restructuring plans. The Exemption 5 standards discussed above apply equally to those records: each communication is either inter- or intra-agency, *see Klamath*, 532 U.S. at 9; the withheld material is both predecisional and deliberative, *see Reps. Comm.*, 3 F.4th at 362; and disclosure would cause reasonably foreseeable harm to

internal deliberations and the quality of agency decisionmaking, *see id.* at 361, 369–70. For clarity, Defendants address each communication in turn before addressing segregability collectively.

**A. <u>February 10, 2026 Production, Page 1.</u>**

This document is a redacted interagency email sent on March 12, 2025, at 7:15 p.m. from OPM's Senior Advisor to the Director to a senior Department of War ("DOW") personnel official regarding a proposed workforce restructuring tool and its potential inclusion in DOW's ARRP. *See* SUMF ¶ 80. OPM's Senior Advisor to the Director was principally responsible for advising on the interagency review of ARRPs and was consulting with DOW regarding its forthcoming submission. *See id.* ¶ 81. The withheld statement conveys the author's candid, preliminary assessment of the proposed tool and his views on how it might be presented. *See id.* ¶ 82

This email was "predecisional." The material was exchanged before any decision had been reached regarding either OPM's approval of the proposed tool or DOW's use of that tool in its ARRP. *See* SUMF ¶ 83. OPM had not yet approved the tool, and DOW had not yet finalized or submitted the ARRP in which the tool might be included. *See id.* ¶ 84.

This email was also "deliberative." The withheld material reflects an internal discussion concerning a proposed workforce restructuring tool and was exchanged to help OPM and DOW formulate their positions on whether and how the tool should be incorporated into DOW's ARRP. *See* SUMF ¶ 85. It also reflects the give-and-take of the consultative process between the agencies by conveying an official's candid, preliminary views on the status of the proposal and how it might be advanced toward a decision. *See id.* ¶ 86. The material is advisory and does not state, embody, or explain a final decision of OPM or DOW. *See id.* ¶ 87.

Lastly, disclosure of the withheld statement would foreseeably harm the consultative process through which OPM advises agencies on their workforce restructuring proposals. *See* SUMF ¶ 88. The statement conveys the candid, preliminary assessment of a single, identifiable

OPM official—the Senior Advisor principally responsible for the interagency review of ARRPs—regarding a tool that OPM had not approved and that DOW had not yet decided to include in its submission, and it was sent the evening before Phase 1 ARRPs were due. *See id.* ¶ 89. If informal, frank advice of this kind were subject to public release, officials in the Senior Advisor's position would foreseeably hedge, soften, or withhold their preliminary assessments of agency proposals, and agencies would be less willing to seek OPM's candid input on sensitive workforce tools before finalizing their plans, knowing that the exchange could later be disclosed and attributed to particular officials. *See id.* ¶ 90. The predictable result would be less rigorous vetting of proposed workforce actions and lower-quality agency submissions and decisions. *See id.* ¶ 91. Disclosure would also reveal the substance, status, and direction of OPM's evaluation of a proposed personnel tool, inviting the public to mistake an option merely under discussion for an action the agencies had decided to adopt. *See id.* ¶ 92.

**B. February 10, 2026 Production, Page 2.**

This document is a redacted interagency email sent on March 28, 2025, at 9:27 p.m. from the Acting Chair of the Equal Employment Opportunity Commission ("EEOC") to OPM's Senior Advisor to the Director regarding feedback OMB had provided on the EEOC's obligations concerning its ARRP. *See* SUMF ¶ 93. The email was exchanged among officials of three federal agencies participating in an ongoing interagency review process in which OPM and OMB evaluated the EEOC's submission. *See id.* ¶ 94.

This email was "predecisional." The withheld material was exchanged while OPM and OMB were reviewing the EEOC's proposed ARRP and before any final determination had been made regarding the issues discussed. *See* SUMF ¶ 95. The OMB feedback reflected an interim step in that ongoing review, and the central issue addressed in the email remained open and actively

contested. *See id.* ¶ 96. The email sought reconsideration of a preliminary position and requested information bearing on that unresolved question. *See id.* ¶ 97.

This email was also "deliberative." The EEOC Acting Chair's analysis, assessments, questions, and opinions regarding OMB's feedback were intended to help the agencies formulate their positions on the EEOC's restructuring proposal. *See* SUMF ¶ 98. They reflected the give-and-take of the consultative process, including advocacy of a position, candid disagreement with a preliminary assessment, a request for reconsideration, supporting arguments, and questions posed to inform further deliberation. *See id.* ¶ 99. None of these statements constituted or explained a final decision of, or adoption by, the EEOC, OPM, or OMB. *See id.* ¶ 100.

Lastly, disclosure would foreseeably harm the government's deliberative process by exposing candid assessments, disagreements, and internal discussions undertaken while the agencies were still formulating their positions on the EEOC's restructuring proposal. *See* SUMF ¶ 101. In particular, release would reveal an agency head's efforts to challenge and seek reconsideration of a preliminary interagency position while the issue remained unresolved. *See id.* ¶ 102. Disclosure of such exchanges would risk chilling similarly candid objections, requests for reconsideration, and frank assessments in future interagency deliberations. *See id.* ¶ 103. It could also confuse the public by exposing preliminary views and proposals that did not necessarily reflect the agencies' ultimate positions. *See id.* ¶ 104.

### C. <u>May 27, 2026 Production, Pages 17, 19, and 73–74.</u>

These documents are redacted intra-agency emails sent on January 25, 2025, at 3:30 p.m., March 3, 2025, at 4:00 p.m., and March 12, 2025, at 7:07 p.m., from OPM employees to OPM's Senior Advisor to the Director concerning the review and development of advice to other federal agencies regarding their workforce restructuring plans. *See* SUMF ¶ 105. The emails discussed

issues arising during OPM's consideration of those plans and the guidance to be provided to the affected agencies. *See id.* ¶ 106.

These emails were "predecisional." They were exchanged before OPM had finalized its advice and guidance and were sent ahead of decisions that had not yet been made, including whether and how to clarify OPM's RIF guidance, whether to approve a proposed restructuring tool, and what final responses OPM would provide to the agencies' outstanding questions. *See* SUMF ¶ 107. Additionally, the draft responses referenced in the March 3 email were submitted to a superior for further review, potential revision, or restructuring. *See id.* ¶ 108.

These emails were also "deliberative." The emails contained internal discussions, questions, and analyses regarding issues arising during OPM's review of agencies' workforce restructuring plans and assisted agency leadership in formulating and developing those plans. *See* SUMF ¶ 109. Each email emanated from a subordinate or advising official to the Senior Advisor for the purpose of obtaining direction, approval, or a decision, and each reflects the author's candid questions, tentative interpretations, recommendations, or draft language. *See id.* ¶ 110.

Lastly, disclosure would cause foreseeable harm by revealing the agency's internal discussions, questions, analyses, and development of advice regarding agencies' workforce restructuring plans before final guidance was issued. *See* SUMF ¶ 111. Release of these communications would inhibit the candid exchange of views among OPM personnel and impair its ability to engage in open and frank internal deliberations. *See id.* ¶ 112. Indeed, employees who know that their exploratory questions, tentative interpretations, recommendations, and draft responses will be publicly released will hesitate to identify problems candidly or to commit preliminary views to writing and will instead raise such matters orally or not at all, degrading both the quality and the record of agency decision making. *See id.* ¶ 113. Release of draft responses

and tentative interpretations may also differ from the guidance OPM ultimately provided, resulting in public confusion about the agency's actual positions. *See id.* ¶ 114.

**D. <u>March 16, 2026 Production, Page 17.</u>**

This document is three parts: (1) a redacted interagency email sent on March 18, 2025, at 12:58 p.m. from an OMB employee to OPM's Senior Advisor to the Director and several other OPM and OMB employees; (2) a redacted interagency email forwarded eight minutes later, at 1:06 p.m., by an OMB employee to an OPM employee; and (3) a spreadsheet attachment entitled, "ARRP Phase 1 Plan Summary Data 3.18.xlsx." *See* SUMF ¶ 115.

The spreadsheet contains interim information which includes notes for follow-up and future actions, such as the need to submit further information. *See* SUMF ¶ 116. The spreadsheet was prepared by OMB staff and was a snapshot of the ARRPs submitted to date. *See id.* ¶ 117. The spreadsheet contains factual and numerical entries alongside reviewers' summaries, annotations, and follow-up notes concerning the submitted ARRPs. *See id.* ¶ 118. The selection, organization, and characterization of that information reflect judgments about which aspects of the agencies' proposed plans warranted attention, while the annotations identify open questions, evaluative concerns, and recommended next steps. *See id.* ¶ 119; *see also Ancient Coin Collectors Guild*, 641 F.3d at 513; *Mapother*, 3 F.3d at 1539. The withheld portions of the emails transmitted the spreadsheet among OPM and OMB staff engaged in the review and briefly addressed its contents and handling. *See* SUMF ¶ 120.

These documents were "predecisional." The spreadsheet was a tool generated to assist the reviewing officials in reaching decisions that had not yet been made, as it summarized the plans submitted to date and flagged entries as incomplete, unclear, or requiring further information from the submitting agencies. *See* SUMF ¶ 121. The accompanying emails likewise predated any final determinations: they circulated the March 18 snapshot among the reviewing officials while the

Phase 1 review remained ongoing and while the open questions and follow-up items flagged in the spreadsheet remained unresolved. *See id.* ¶ 122.

They were also "deliberative." The spreadsheet was prepared to assist OMB and OPM officials in evaluating the submitted restructuring proposals and formulating their positions on issues requiring further review. *See* SUMF ¶ 123. Its summaries, annotations, questions, and recommended follow-up actions reflect the reviewers' preliminary assessments and the ongoing give-and-take of the interagency review process. *See id.* ¶ 124. The spreadsheet did not embody, and was not incorporated into, any final position or decision of OMB or OPM. *See id.* ¶ 125.

The emails were similarly "deliberative" in that they were exchanged among OPM and OMB staff participating in the review for the purpose of sharing the interim snapshot and coordinating the next steps in the evaluation of the submitted plans, and their withheld portions reflect the same preliminary assessments, open questions, and follow-up items as the spreadsheet they transmitted. *See* SUMF ¶ 126. Like the spreadsheet, the emails do not state, embody, or explain any final decision of OPM or OMB. *See id.* ¶ 127.

Lastly, disclosure of the spreadsheet and accompanying emails would foreseeably harm the interagency review process in concrete ways. *See* SUMF ¶ 128. First, the spreadsheet records the reviewers' working annotations—where they believed submissions were incomplete or unclear, which entries required follow-up with the submitting agencies, and how they tentatively characterized agencies' proposed plans. *See id.* ¶ 129. Staff who know that working notes of this kind will be publicly released and attributed to them would foreseeably decline to record candid annotations flagging gaps, doubts, and concerns, or would sanitize those notes, degrading both the quality and the record of future reviews. *See id.* ¶ 130. Second, disclosure would publicly associate individual agencies with unverified figures, tentative characterizations, and unresolved questions

that reflected only interim staff impressions rather than any determination of OPM or OMB, exposing those agencies and their employees to scrutiny and external pressure based on information the reviewers themselves had flagged as incomplete, unclear, or potentially inaccurate. *See id.* ¶ 131. Third, because the snapshot's entries were subject to change as agencies supplemented and revised their submissions, release would foreseeably mislead the public by presenting an interim and potentially erroneous picture of agencies' plans as though it reflected final restructuring decisions, generating the same confusion, personnel departures, and external pressures described above in connection with the ARRPs themselves. *See id.* ¶ 132.

**E. OPM Satisfied FOIA's Segregability Requirements.**

Finally, OPM has satisfied its segregability obligations with respect to the challenged communications withholdings. OPM conducted a line-by-line review of all the challenged communication withholdings to assess whether any reasonably segregable, non-exempt information could be released, including whether factual material could be meaningfully separated from deliberative content. *See* SUMF ¶ 133. OPM determined that the withheld material in each of the six challenged communications either consists of deliberative content—candid assessments, recommendations, opinions, questions, and preliminary evaluations exchanged in the course of the deliberations described above—or contains factual material so inextricably intertwined with that deliberative content that it could not be released without revealing the substance of the agencies' deliberations. *See id.* ¶ 134. No reasonably segregable, non-exempt information has been withheld from the challenged communications. *See id.* ¶ 135.

OPM also conducted a line-by-line review of all the challenged communication withholdings to assess whether any reasonably segregable exempt portions of those documents could be segregated and released without causing foreseeable harm. *See* SUMF ¶ 136. OPM determined that no reasonably segregable portion of the exempt information could be released

without causing the foreseeable harms described above, because even partial disclosure would reveal tentative recommendations, evaluative judgments, proposed courses of action, or other aspects of the agencies' internal deliberations. *See id*. ¶ 137.

Because each challenged communication withholding protects predecisional and deliberative material whose disclosure would cause foreseeable harm, and no further reasonably segregable information can be released, Defendants are entitled to summary judgment as to the six remaining communication withholdings.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment and enter judgment as a matter of law in their favor on all claims.

Dated: August 17, 2026
Washington, D.C.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ Benjamin H. Zieman
Benjamin H. Zieman
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530
202-252-2540
benjamin.zieman@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRACY FORWARD FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF PERSONNEL MANAGEMENT, et al.,<br><br>Defendants. | Civil Action No. 25-0858 (SLS) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' motion for summary judgment, the memoranda in support thereof and in opposition thereto, and the entire record herein, it is hereby

ORDERED that Defendants' motion is GRANTED; and it is further

ORDERED that judgment as a matter of law is entered in favor of Defendants on Plaintiff's claims.

SO ORDERED:

__________________
Date

__________________________________
SPARKLE L. SOOKNANAN
United States District Judge