UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRACY FORWARD FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF PERSONNEL MANAGEMENT, et al.,<br><br>Defendants. | Civil Action No. 25-0858 (SLS) |

**DECLARATION OF LANCE HARRIS**

I, Lance Harris, make the following statements:

1. I currently serve as the Chief FOIA Officer at the U.S. Office of Personnel Management ("OPM"). I have held this position since May 18, 2026. In this capacity, I oversee the receipt and processing of all requests for records maintained by OPM pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. I am familiar with OPM's procedures for responding to FOIA requests and with the application of FOIA's exemptions, including Exemption 5.

2. My declaration is made jointly for and on behalf of OPM and the Office of Management and Budget ("OMB"). I affirm that the statements set forth herein are true and correct with respect to both agencies, and that one declaration is being provided in lieu of separate declarations for each agency.

3. The statements contained in this declaration are based upon my personal knowledge, information and belief, my review of the records at issue, information provided to me by OPM and OMB staff acting within the scope of their official duties, and my familiarity, based

on that review and information, with the development, submission and review of Agency Reduction-in-Force and Reorganization Plans ("ARRPs").

4. The information I have regarding OMB was gathered through consultations with OMB staff, as well as through my review of relevant records and materials. My statements regarding OMB are accordingly based both on information provided by OMB staff acting within the scope of their official duties and on official documentation.

5. The purpose of this declaration is twofold: First, to explain the basis for the determination to withhold in full the ARRPs pursuant to the deliberative process privilege incorporated into Exemption 5; and second, to explain the basis for the challenged withholdings in certain communications pursuant to Exemption 5.

## EXECUTIVE ORDER AND AGENCY GUIDANCE

6. On February 11, 2025, the President issued Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*. The Executive Order called for a "critical transformation" of the Government to reduce "waste" and "insularity." It directed agencies to submit to OMB a report "discuss[ing] whether the agency or any of its subcomponents should be eliminated or consolidated."

7. Executive agencies cannot effectively carry out a "critical transformation" by acting in isolation. Changes at one agency may significantly affect the mission of another and may advance or impede the President's policy agenda. Accordingly, to implement the President's call for transformation, the Director of OMB and the Acting Director of OPM jointly issued a Memorandum on February 26, 2025, providing for interagency coordination of agencies' efforts to reorganize themselves. *See* Exhibit 1.

8. The Memorandum established a two-phase planning process. In Phase 1, each agency was instructed to prepare a plan setting out the agency's views on whether "the agency or any of its subcomponents should be eliminated or consolidated," and "which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities." *Id.* at 4. To support those views, each agency was asked to lay out relevant considerations, such as the extent of the agency's understanding of its legal obligations and the level of resources required, from the agency's perspective, to fulfill those obligations. *Id.* at 3-4. The Memorandum also asked agencies about their intent to use various "specific tools," such as hiring freezes, regular attrition, or reductions in force ("RIFs"). Agencies were directed to structure these Phase 1 submissions around the Administration's broader workforce-reduction and reorganization objectives so that OPM and OMB could evaluate whether each agency's proposed approach aligned with those objectives. Phase 1 ARRPs were due to OPM and OMB by March 13, 2025. *Id.* at 4.

9. Phase 2 called for a more developed account of each agency's future operations. The Memorandum sought each agency's "vision for more productive, efficient agency operations going forward." *See* Exhibit 1 at 4. That submission was to reflect the agency's position on how its functions and resources could be restructured to reduce costs, enhance accountability, improve mission delivery, and align with the President's policy priorities. *Id*. at 4-6. Agencies were asked to describe how they might achieve such a restructuring, and along what timeline. *Id.* at 6. Phase 2 ARRPs were due to OPM and OMB by April 14, 2025. *Id.* at 4.

10. Submission of the Phase 1 and 2 ARRPs to OPM and OMB enabled essential interagency deliberations over the composition, structure and focus of Executive Branch agencies, with the goal of achieving the "critical transformation" called for by the President. These deliberations included cross-agency deconfliction and coordination to ensure a unified and

cohesive government-wide approach. For its part, OMB reviewed agencies' submissions to gauge to what extent agencies' positions aligned with statutory requirements, existing funding availability, tentative plans for future budgets, and the President's policy positions and agenda. Where OMB had questions about an agency's ideas, OMB officials or staff conferred with counterparts at the agency to ensure that any policy disagreements were identified and elevated as appropriate. For its part, OPM reviewed agencies' submissions with particular attention to their proposed use of workforce tools—such as hiring freezes, attrition, early retirement and separation incentives, and RIFs—to assess whether those proposals complied with the President's policy positions and agenda, applicable civil service laws and regulations, and applicable OPM guidance, and to identify where agencies would require guidance or technical assistance from OPM to carry out their proposals. Where OPM identified questions or concerns regarding an agency's proposed approach, OPM officials or staff likewise conferred with counterparts at the submitting agency.

11. The ARRP development and submission process was intended neither to yield a set of marching orders nor to produce a final agency plan—that is, an OPM- and OMB-approved ARRP that the agency head would be committed to carry out. Instead, the process was designed to give OPM and OMB a preliminary view of how each agency proposed to approach reorganization and an opportunity to assess whether that approach might align—or not—with the Administration's broader workforce-reduction and reorganization objectives. That foundational work would allow for easier adjustments in the inevitable event that agencies' initial plans changed over time.

12. In sum, Phase 1 ARRPs functioned as early diagnostic and planning documents. They gave OPM and OMB an initial view of each agency's proposed direction, priorities, and methods, allowing them to identify areas of agreement, concern, or potential conflict before Phase

2 required agencies to articulate a more developed vision for future-state organization, additional RIFs, real estate changes, and implementation details.

### PLAINTIFF'S FOIA REQUESTS

13. On March 12, 2025, Plaintiff submitted three FOIA requests relevant here: one to OMB, which OMB acknowledged on March 25, 2025, and assigned tracking number 2025-1131, and two to OPM, which OPM acknowledged on April 1, 2025, and assigned tracking numbers 25-OPM-1201-F and 25-OPM-1202-F, respectively.

14. The request to OMB bearing tracking number 2025-1131 sought, for the period beginning February 1, 2025, "[a]ll Agency RIF and Reorganization Plans ('ARRPs') submitted to OMB . . . by heads and acting heads of departments and agencies as required by" the February 26, 2025 Memorandum. On July 30, 2025, OMB communicated its final determination to Plaintiff that, except for one ARRP that had been released as part of the administrative record in another matter, all other ARRPs were predecisional and deliberative and were therefore being withheld in full pursuant to Exemption 5.

15. The request to OPM bearing tracking number 25-OPM-1201-F likewise sought, for the period beginning February 1, 2025, "[a]ll Agency RIF and Reorganization Plans ('ARRPs') submitted to OPM . . . by heads and acting heads of departments and agencies as required by" the February 26, 2025 Memorandum. On September 2, 2025, OPM communicated its final determination to Plaintiff that all ARRPs were being withheld in full pursuant to Exemption 5.

16. The request to OPM bearing tracking number 25-OPM-1202-F sought records for the period beginning January 20, 2025, and contained two subparts.

17. Subpart 1 sought: "All electronic communications (including emails, email attachments, complete email chains, calendar invitations, calendar invitation attachments, text

messages, or messages on messaging platforms) of Acting Director Ezell, Chief of Staff Amanda Scales, Senior Advisor Brian Bjelde, Senior Advisor Riccardo Biasini, and/or Senior Advisor Noah Peters, regarding the development, approval, and implementation of ARRPs, including directives and guidance sent to other agencies."

18. In response to Subpart 1, OPM made six productions: August 29, 2025 (11 pages withheld in part pursuant to Exemptions 5 and 6); January 8, 2026 (38 pages withheld in part pursuant to Exemptions 5 and 6); a separate production on January 8, 2026 (1 page withheld in part pursuant to Exemption 5); February 10, 2026 (5 pages withheld in part pursuant to Exemptions 5 and 6); March 16, 2026 (3 pages withheld in part pursuant to Exemptions 5 and 6); and May 27, 2026 (79 pages withheld in part pursuant to Exemptions 5 and 6).

19. Subpart 2 sought: "All electronic communications (including emails, email attachments, complete email chains, calendar invitations, calendar invitation attachments, text messages, or messages on messaging platforms) between (1) any OPM officials listed below (or otherwise affiliated with) the Department of Government Efficiency ('DOGE') (also known as the U.S. 'DOGE' (previously 'Digital') Service), and (2) Elon Musk, or any representatives of Elon Musk or DOGE, or any representatives of the Executive Office of the President (including, but not limited to, emails ending in eop.gov). [list of twenty-six specified officials omitted]." On July 30, 2025, Plaintiff agreed to reduce the number of custodians in Subpart 2 from twenty-six to nine and to defer processing of email attachments.

20. In response to Subpart 2, OPM made its first and final production on March 16, 2026, producing 64 pages withheld in part pursuant to Exemptions 5 and 6.

21. On June 1, 2026, Plaintiff provided OPM and OMB with a list identifying the withholdings it intended to challenge, limited to those asserted under Exemption 5.

22. For the request to OMB and the request to OPM bearing tracking number 25-OPM-1201-F, Plaintiff indicated that it would challenge the withholding in full of all ARRPs.

23. For the request to OPM bearing tracking number 25-OPM-1202-F, Plaintiff identified eleven communication withholdings that it intended to challenge—ten pertaining to Subpart 1 and one pertaining to Subpart 2.

**ARRPs Withheld Pursuant to Exemption 5**
**(2025-1131 and 25-OPM-1201-F)**

24. In response to Executive Order 14210 and the joint Memorandum, OPM and OMB received a total of approximately 147 Phase 1 ARRPs. *See* Exhibit 2. Those submissions came from both small and large Federal agencies, commissions, and boards. In some cases, agencies submitted more than one iteration of their Phase 1 ARRP. Throughout March and April 2025, the Phase 1 ARRPs underwent initial review at OPM and OMB. Subsequently, during the second phase, agencies submitted Phase 2 ARRPs for review by OPM and OMB. The Phase 2 ARRPs are outside the scope of Plaintiff's FOIA requests and will not be discussed further.

**ARRPs Were Predecisional**

25. Based on my familiarity with the process, the Phase 1 ARRPs reflected agencies' initial assessments and preliminary views concerning potential workforce reductions, organizational changes, and resource allocation. They were prepared and submitted before agencies reached final decisions concerning those matters, and several expressly noted that their proposals were subject to change or not yet fully formulated.

26. OPM and OMB likewise did not treat proposals contained in Phase 1 ARRPs as commitments or firm decisions by the submitting agency to carry out any particular workforce change. The ARRPs contained proposed courses of action, including recommendations concerning staffing levels, consolidation of functions, organizational structure, and reductions in

force, based in part on assumptions and projections concerning resource availability, appropriations, and policy priorities. Because those assumptions and projections could change, the proposals based upon them could change as well.

27. In fact, several actions proposed in the Phase 1 ARRPs, including large-scale reductions in force, could not be implemented merely by their inclusion in an ARRP and would require additional preparation, legal review, possible congressional notification, and other implementing steps. As a result, proposals contained in the ARRPs remained subject to revision as the planning process continued.

28. None of the withheld Phase 1 ARRPs constituted a final decision or policy of OPM or OMB. Nor, to my knowledge, did OPM or OMB adopt any withheld ARRP, in whole or in part, as its own final position or incorporate it by reference into a final decision.

## ARRPs Were Deliberative

29. Although the specific contents of individual ARRPs varied according to the mission and structure of the submitting agency, they shared several common characteristics. For example, they contained recommendations, evaluations, proposed options, subjective analysis, and policy and organizational alternatives concerning such matters as staffing levels, organizational structure, resource allocation, consolidation of functions, and potential workforce reductions. They also reflected evaluative judgments about which functions or positions might be non-essential or duplicative and proposed approaches for carrying out reorganizations and reductions in force.

30. The Phase 1 ARRPs were prepared specifically to facilitate discussion and decisionmaking among agency leadership, OPM, OMB, budget personnel, and policy officials by helping those participants formulate their positions concerning an agency's composition, structure, priorities, staffing, and funding. The submissions also served as a basis for further review,

discussion, and feedback among the relevant officials, and agencies could revise their proposals as that process unfolded. The fact that some agencies submitted more than one version of a Phase 1 ARRP further reflected the iterative nature of the development and review process and the potential for agencies' proposals to evolve through further analysis and discussion.

## Disclosure of ARRPs Would Cause Foreseeable Harm

31. Disclosure of the Phase 1 ARRPs would reveal an agency's proposals, projections, estimates, and recommendations regarding matters that remained undetermined at the time the plans were prepared. Disclosure of the Phase 1 ARRPs would also reveal how agencies internally evaluated future workforce needs and expose assumptions underlying proposed recommendations, including legal assessments, policy considerations, and resource allocations.

32. Public disclosure of these preliminary assessments would predictably alter the manner in which agency officials participate in similar deliberations. Because the recommendations concern matters that directly affect agency components, employees, unions, contractors, congressional stakeholders, and program beneficiaries, officials would reasonably expect disclosed proposals to generate immediate scrutiny, opposition, or pressure directed at particular options and at the officials who proposed or evaluated them. In response, agencies would be likely to temper their assessments, avoid identifying particularly sensitive deficiencies or unpopular alternatives, omit options that might provoke controversy, or frame their recommendations for an outside audience rather than provide OPM and OMB with their most candid assessment of the agency's needs and available choices.

33. That chilling effect would impair the decision-making process in concrete ways. OPM and OMB depend on agencies to provide complete and forthright information regarding operational needs, resource constraints, legal considerations, workforce consequences, and the

advantages and disadvantages of competing approaches, especially when considering how changes at one agency may impact the mission of another, and advance or impede the President's policy agenda. If agencies provide only guarded or incomplete assessments, OPM and OMB will be less able to test the agencies' assumptions, identify weaknesses in their proposals, compare alternatives, reconcile competing priorities, and formulate coherent recommendations. OPM and OMB would likewise be less candid in their assessment, questions, and proposed revisions if their preliminary reactions could be publicly disclosed and attributed to them.

34. Disclosure would also risk portraying tentative proposals, assumptions or alternatives as final agency or Administration decisions. That misunderstanding could generate departures of agency personnel (including personnel whose positions would not eventually be eliminated), operational disruption, lobbying, litigation, and other external pressures while the proposals remain under consideration. Those reactions could constrain the available options and distort the process before decisionmakers have completed their review. Disclosure therefore would not merely reveal a past deliberation; it would foreseeably reduce the completeness and candor of comparable agency submissions and interagency exchanges going forward, depriving decisionmakers of the frank analysis necessary to make informed and effective organizational, workforce, and budgetary decisions.

35. The foreseeable harms associated with disclosure are particularly significant here because the ARRPs concern issues that are among the most sensitive and consequential matters of an agency. The records contain recommendations regarding organizational restructuring, workforce management, allocation of resources, statutory responsibilities, and budget planning. Effective decision-making in these areas depends on the ability of agency personnel to communicate candidly, evaluate alternatives thoroughly, identify weaknesses, and propose

innovative or controversial solutions without concern that preliminary discussions will later be disclosed.

36. In sum, disclosure of the ARRPs would have a chilling effect on the frank and candid exchange between OMB, OPM, and the submitting agencies, causing foreseeable harm to the integrity, effectiveness, and quality of the Executive's decisionmaking process.

### SEGREGABILITY

37. OPM conducted a line-by-line review of all the Phase 1 ARRPs to assess whether any reasonably segregable, non-exempt information could be released. In particular, OPM carefully evaluated each submission to determine whether factual material could be meaningfully separated from deliberative content.

38. OPM determined that factual material contained in the Phase 1 ARRPs could not be separated from the deliberative process because the agencies' selection, organization, emphasis, and presentation of those facts themselves reflected evaluative judgments about the matters under consideration. For example, the decision to include particular staffing data, resource information, organizational characteristics, or historical facts—and the manner in which those facts were presented—would reveal what the submitting agency considered significant in developing its proposed approach to reorganization. In those circumstances, disclosure of the factual material would reveal aspects of the agency's deliberative analysis rather than disclose purely factual information standing apart from that analysis.

39. Even to the extent any factual or other information in the ARRPs could be considered non-exempt, that information was inextricably intertwined with recommendations, evaluations, and other deliberative material. Segregating that information would require extensive line-by-line redactions throughout the documents and would impose significant costs on the

agencies, while leaving documents consisting largely of isolated words, phrases, data points, or fragments whose meaning and significance derive largely from the surrounding deliberative context and which, standing alone, would have little informational value.

40. OPM also conducted a line-by-line review of all the Phase 1 ARRPs to assess whether any reasonably segregable exempt portions of those documents could be segregated and released without causing foreseeable harm.

41. OPM determined that no reasonably segregable portion of the exempt information could be released without causing the foreseeable harms described above, because even partial disclosure would reveal tentative recommendations, evaluative judgments, proposed courses of action, or other aspects of the agencies' internal deliberations.

**NO WAIVER OF PRIVILEGE**

42. While preparing this declaration, I learned that three agencies released their Phase 1 ARRPs in full (inclusive of the agency disclosure referenced in paragraph 14) and a fourth released their Phase 1 ARRP in part. The release of these plans, in full or in part, does not alter the need to withhold the remaining Phase 1 ARRPs in their entirety. The records remain predecisional and deliberative as to the individual submitting agency's own decision-making process. Those individualized determinations should not be construed as establishing a binding precedent for the treatment of the other plans. Hence, the prior disclosures by certain agencies do not constitute a waiver of privilege by others.

**OPM COMMUNICATIONS WITHHELD PURSUANT TO EXEMPTION 5**
**(25-OPM-1202-F)**

43. As noted earlier, Plaintiff identified eleven communication withholdings that it intended to challenge—ten pertaining to Subpart 1 and one pertaining to Subpart 2.

44. Upon further review, OPM confirmed that Plaintiff's eleven identified challenges correspond to eleven distinct communication withholdings, although not in precisely the manner reflected in Plaintiff's list. Plaintiff's single challenge concerning the February 10, 2026 production encompassed two separate communications (pages 1 and 2). Conversely, Plaintiff separately challenged two pages from the May 27, 2026 production that had been withheld in full—pages 76 and 77—even though those pages were part of the same communication spanning pages 75–78. These two adjustments offset one another numerically, leaving eleven distinct communication withholdings at issue.

45. Of those eleven challenged communication withholdings, OPM has determined that five do not meet the standard for withholding under Exemption 5 and thus decided to release the corresponding communications to Plaintiff. Those communication withholdings concern records produced on August 29, 2025 (page 7), in the separate January 8, 2026 production (page 1), and on May 27, 2026 (pages 18, 75–78, and 79).

46. Accordingly, six communication withholdings remain at issue—five pertaining to Subpart 1 and one pertaining to Subpart 2.

47. The five Subpart 1 communication withholdings at issue concern records produced on February 10, 2026 (pages 1 and 2) and May 27, 2026 (pages 17, 19, and 73–74).

48. The single Subpart 2 communication withholding at issue concerns a record produced on March 16, 2026 (page 17).

**February 10, 2026 Production, Page 1**

49. This document is a redacted interagency email sent on March 12, 2025, at 7:15 p.m. from OPM's Senior Advisor to the Director to a senior Department of War ("DOW") personnel official regarding a proposed workforce restructuring tool and its potential inclusion in DOW's

ARRP. OPM's Senior Advisor to the Director was principally responsible for advising on the interagency review of ARRPs and was consulting with DOW regarding its forthcoming submission. The withheld statement conveys the author's candid, preliminary assessment of the proposed tool and his views on how it might be presented.

50. Predecisional: The material was exchanged before any decision had been reached regarding either OPM's approval of the proposed tool or DOW's use of that tool in its ARRP. OPM had not yet approved the tool, and DOW had not yet finalized or submitted the ARRP in which the tool might be included.

51. Deliberative: The withheld material reflects an internal discussion concerning a proposed workforce restructuring tool and was exchanged to help OPM and DOW formulate their positions on whether and how the tool should be incorporated into DOW's ARRP. It also reflects the give-and-take of the consultative process between the agencies by conveying an official's candid, preliminary views on the status of the proposal and how it might be advanced toward a decision. The material is advisory and does not state, embody, or explain a final decision of OPM or DOW.

52. Foreseeable Harm: Disclosure of the withheld statement would foreseeably harm the consultative process through which OPM advises agencies on their workforce restructuring proposals. The statement conveys the candid, preliminary assessment of a single, identifiable OPM official—the Senior Advisor principally responsible for the interagency review of ARRPs—regarding a tool that OPM had not approved and that DOW had not yet decided to include in its submission, and it was sent the evening before Phase 1 ARRPs were due. If informal, frank advice of this kind were subject to public release, officials in the Senior Advisor's position would foreseeably hedge, soften, or withhold their preliminary assessments of agency proposals, and

agencies would be less willing to seek OPM's candid input on sensitive workforce tools before finalizing their plans, knowing that the exchange could later be disclosed and attributed to particular officials. The predictable result would be less rigorous vetting of proposed workforce actions and lower-quality agency submissions and decisions. Disclosure would also reveal the substance, status, and direction of OPM's evaluation of a proposed personnel tool, inviting the public to mistake an option merely under discussion for an action the agencies had decided to adopt.

**FEBRUARY 10, 2026 PRODUCTION, PAGE 2**

53. This document is a redacted interagency email sent on March 28, 2025, at 9:27 p.m. from the Acting Chair of the Equal Employment Opportunity Commission ("EEOC") to OPM's Senior Advisor to the Director regarding feedback OMB had provided on the EEOC's obligations concerning its ARRP. The email was exchanged among officials of three federal agencies participating in an ongoing interagency review process in which OPM and OMB evaluated the EEOC's submission.

54. Predecisional: The withheld material was exchanged while OPM and OMB were reviewing the EEOC's proposed ARRP and before any final determination had been made regarding the issues discussed. The OMB feedback reflected an interim step in that ongoing review, and the central issue addressed in the email remained open and actively contested. The email sought reconsideration of a preliminary position and requested information bearing on that unresolved question.

55. Deliberative: The EEOC Acting Chair's analysis, assessments, questions, and opinions regarding OMB's feedback were intended to help the agencies formulate their positions on the EEOC's restructuring proposal. They reflected the give-and-take of the consultative

process, including advocacy of a position, candid disagreement with a preliminary assessment, a request for reconsideration, supporting arguments, and questions posed to inform further deliberation. None of these statements constituted or explained a final decision of, or adoption by, the EEOC, OPM, or OMB.

56. Foreseeable Harm: Disclosure would foreseeably harm the government's deliberative process by exposing candid assessments, disagreements, and internal discussions undertaken while the agencies were still formulating their positions on the EEOC's restructuring proposal. In particular, release would reveal an agency head's efforts to challenge and seek reconsideration of a preliminary interagency position while the issue remained unresolved. Disclosure of such exchanges would risk chilling similarly candid objections, requests for reconsideration, and frank assessments in future interagency deliberations. It could also confuse the public by exposing preliminary views and proposals that did not necessarily reflect the agencies' ultimate positions.

**MAY 27, 2026 PRODUCTION, PAGES 17, 19, AND 73–74**

57. These documents are redacted intra-agency emails sent on January 25, 2025, at 3:30 p.m., March 3, 2025, at 4:00 p.m., and March 12, 2025, at 7:07 p.m., from OPM employees to OPM's Senior Advisor to the Director concerning the review and development of advice to other federal agencies regarding their workforce restructuring plans. The emails discussed issues arising during OPM's consideration of those plans and the guidance to be provided to the affected agencies.

58. Predecisional: The emails were exchanged before OPM had finalized its advice and guidance. Each email was sent ahead of decisions that had not yet been made, including whether and how to clarify OPM's RIF guidance, whether to approve a proposed restructuring tool, and

what final responses OPM would provide to the agencies' outstanding questions. Additionally, the draft responses referenced in the March 3 email were submitted to a superior for further review, potential revision, or restructuring.

59. Deliberative: The communications contained internal discussions, questions, and analyses regarding issues arising during OPM's review of agencies' workforce restructuring plans and assisted agency leadership in formulating and developing those plans. Each email emanated from a subordinate or advising official to the Senior Advisor for the purpose of obtaining direction, approval, or a decision, and each reflects the author's candid questions, tentative interpretations, recommendations, or draft language.

60. Foreseeable Harm: Disclosure of these emails would reveal the agency's internal discussions, questions, analyses, and development of advice regarding agencies' workforce restructuring plans before final guidance was issued. Release of these communications would inhibit the candid exchange of views among OPM personnel and impair its ability to engage in open and frank internal deliberations. Indeed, employees who know that their exploratory questions, tentative interpretations, recommendations, and draft responses will be publicly released will hesitate to identify problems candidly or to commit preliminary views to writing and will instead raise such matters orally or not at all, degrading both the quality and the record of agency decisionmaking. Release of draft responses and tentative interpretations may also differ from the guidance OPM ultimately provided, resulting in public confusion about the agency's actual positions.

### MARCH 16, 2026 PRODUCTION, PAGE 17

61. This document is three parts: (1) a redacted interagency email sent on March 18, 2025, at 12:58 p.m. from an OMB employee to OPM's Senior Advisor to the Director and several

other OPM and OMB employees; (2) a redacted interagency email forwarded eight minutes later, at 1:06 p.m., by an OMB employee to an OPM employee; and (3) a spreadsheet attachment entitled, "ARRP Phase 1 Plan Summary Data 3.18.xlsx." The spreadsheet contains interim information which includes notes for follow-up and future actions, such as the need to submit further information. The spreadsheet was prepared by OMB staff and was a snapshot of the ARRPs submitted to date. The spreadsheet contains factual and numerical entries alongside reviewers' summaries, annotations, and follow-up notes concerning the submitted ARRPs. The selection, organization, and characterization of that information reflect judgments about which aspects of the agencies' proposed plans warranted attention, while the annotations identify open questions, evaluative concerns, and recommended next steps. The withheld portions of the emails transmitted the spreadsheet among OPM and OMB staff engaged in the review and briefly addressed its contents and handling.

62. <u>Predecisional</u>: The spreadsheet was a tool generated to assist the reviewing officials in reaching decisions that had not yet been made, as it summarized the plans submitted to date and flagged entries as incomplete, unclear, or requiring further information from the submitting agencies. The accompanying emails likewise predated any final determinations: they circulated the March 18 snapshot among the reviewing officials while the Phase 1 review remained ongoing and while the open questions and follow-up items flagged in the spreadsheet remained unresolved.

63. <u>Deliberative</u>: The spreadsheet was prepared to assist OMB and OPM officials in evaluating the submitted restructuring proposals and formulating their positions on issues requiring further review. Its summaries, annotations, open questions, and recommended follow-up actions reflect the reviewers' preliminary assessments and the ongoing give-and-take of the interagency review process. The spreadsheet did not embody, and was not incorporated into, any final position

or decision of OMB or OPM. The emails were similarly deliberative. They were exchanged among OPM and OMB staff participating in the review for the purpose of sharing the interim snapshot and coordinating the next steps in the evaluation of the submitted plans, and their withheld portions reflect the same preliminary assessments, open questions, and follow-up items as the spreadsheet they transmitted. Like the spreadsheet, the emails do not state, embody, or explain any final decision of OPM or OMB.

64. Foreseeable Harm: Disclosure of the spreadsheet and accompanying emails would foreseeably harm the interagency review process in concrete ways. First, the spreadsheet records the reviewers' working annotations—where they believed submissions were incomplete or unclear, which entries required follow-up with the submitting agencies, and how they tentatively characterized agencies' proposed plans. Staff who know that working notes of this kind will be publicly released and attributed to them would foreseeably decline to record candid annotations flagging gaps, doubts, and concerns, or would sanitize those notes, degrading both the quality and the record of future reviews. Second, disclosure would publicly associate individual agencies with unverified figures, tentative characterizations, and unresolved questions that reflected only interim staff impressions rather than any determination of OPM or OMB, exposing those agencies and their employees to scrutiny and external pressure based on information the reviewers themselves had flagged as incomplete, unclear, or potentially inaccurate. Third, because the snapshot's entries were subject to change as agencies supplemented and revised their submissions, release would foreseeably mislead the public by presenting an interim and potentially erroneous picture of agencies' plans as though it reflected final restructuring decisions, generating the same confusion, personnel departures, and external pressures described above in connection with the ARRPs themselves.

## SEGREGABILITY

65. OPM conducted a line-by-line review of all the challenged communication withholdings to assess whether any reasonably segregable, non-exempt information could be released. In particular, OPM evaluated each communication to determine whether factual material could be meaningfully separated from deliberative content.

66. OPM determined that the withheld material in each of the six challenged communications either consists of deliberative content—candid assessments, recommendations, opinions, questions, and preliminary evaluations exchanged in the course of the deliberations described above—or contains factual material so inextricably intertwined with that deliberative content that it could not be released without revealing the substance of the agencies' deliberations. No reasonably segregable, non-exempt information has been withheld.

67. OPM also conducted a line-by-line review of all the challenged communication withholdings to assess whether any reasonably segregable exempt portions of those documents could be segregated and released without causing foreseeable harm.

68. OPM determined that no reasonably segregable portion of the exempt information could be released without causing the foreseeable harms described above, because even partial disclosure would reveal tentative recommendations, evaluative judgments, proposed courses of action, or other aspects of the agencies' internal deliberations.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Executed in Washington, D.C., on this seventeenth day of August, 2026.

LANCE HARRIS

Digitally signed by LANCE HARRIS
Date: 2026.08.17 15:59:54 -04'00'

Lance Harris
Chief FOIA Officer
U.S. Office of Personnel Management

# **Exhibit 1**

U.S. Office of
Management and Budget

U.S. Office of
Personnel Management

# MEMORANDUM

**TO:** Heads of Executive Departments and Agencies

**FROM:** Russell T. Vought, Director, Office of Management and Budget; Charles Ezell, Acting Director, Office of Personnel Management.

**DATE**: February 26, 2025

**RE**: Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*

---

## I. Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

## II. Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1. Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

## III. Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each. Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

## IV. Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V. Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI. Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("***CHCOs***"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

## Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook**. RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

### Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

### Step 2: Planning, Preparation & Analysis (up to 30 days)

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

### Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

### Step 4: RIF Implementation & Separation (Final Step)

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

# Exhibit 2

**Agency RIF and Reorganization Plans (ARRP) – Phase 1 Submissions**

| Agency ARRP Phase 1 Submissions (March 13, 2025) | Versions |
|---|---|
| **CFO Act Agencies** | |
| Department of Agriculture | 1 |
| USDA OIG | 1 |
| Department of Commerce | 1 |
| DOC OIG | 1 |
| Department of Defense | 1 |
| Department of Education | 1 |
| ED OIG | 1 |
| Department of Energy | 1 |
| DOE OIG | 1 |
| Department of Health and Human Services | 1 |
| HHS OIG | 1 |
| Department of Homeland Security | 1 |
| DHS OIG | 1 |
| Department of Housing and Urban Development | 1 |
| HUD OIG | 1 |
| Department of the Interior | 1 |
| DOI OIG | 1 |
| Department of Justice | 1 |
| DOJ OIG | 1 |
| Department of Labor | 1 |
| DOL OIG | 1 |
| Department of State | 1 |
| State OIG | 1 |
| Department of Transportation | 1 |
| DOT OIG | 1 |
| Department of the Treasury | 1 |
| Department of Veterans Affairs | 1 |
| VA OIG | 1 |
| Environmental Protection Agency | 1 |
| EPA OIG | 1 |
| General Services Administration | 1 |
| GSA OIG | 1 |
| National Aeronautics and Space Administration | 1 |
| NASA OIG | 1 |
| Nuclear Regulatory Commission | 1 |
| NRC OIG | 1 |
| National Science Foundation | 1 |

| | |
|---|---|
| NSF OIG | 1 |
| Office of Personnel Management | 1 |
| OPM OIG | 1 |
| Small Business Administration | 2 |
| Social Security Administration | 1 |
| SSA OIG | 1 |
| USAID OIG | 1 |
| **Non-CFO Act Agencies** | |
| AbilityOne Commission | 1 |
| AbilityOne OIG | 1 |
| Access Board | 1 |
| Administrative Conference of the United States | 1 |
| Advisory Council on Historic Preservation | 1 |
| American Battle Monuments Commission | 1 |
| AmeriCorps | 1 |
| AmeriCorps OIG | 1 |
| Appalachian Regional Commission | 1 |
| Appraisal Subcommittee of the Federal Financial Institutions Examination Council | 1 |
| Armed Forces Retirement Home | 1 |
| Barry Goldwater Scholarship Foundation | 1 |
| Chemical Safety Board | 1 |
| Civil Rights Cold Case Records Review Board | 1 |
| Commission of Fine Arts | 1 |
| Commodity Futures Trading Commission | 1 |
| Commodity Futures Trading Commission OIG | 1 |
| Consumer Product Safety Commission | 2 |
| Consumer Product Safety Commission OIG | 1 |
| Council of the Inspectors General on Integrity and Efficiency | 1 |
| Court Services and Offender Supervision Agency for DC | 1 |
| Delta Regional Authority | 1 |
| Denali Commission | 1 |
| Election Assistance Commission | 1 |
| Election Assistance Commission OIG | 1 |
| Equal Employment Opportunity Commission | 1 |
| Export-Import Bank of the United States | 1 |
| Export-Import Bank of the United States OIG | 1 |
| Farm Credit Administration | 1 |
| Federal Communications Commission | 1 |
| Federal Communications Commission OIG | 1 |
| Federal Deposit Insurance Corporation | 1 |
| Federal Deposit Insurance Corporation OIG | 1 |
| Federal Energy Regulatory Commission | 1 |
| Federal Housing Finance Agency | 1 |

| | |
|---|---|
| Federal Housing Finance Agency OIG | 1 |
| Federal Labor Relations Authority | 1 |
| Federal Labor Relations Authority OIG | 1 |
| Federal Maritime Commission | 1 |
| Federal Maritime Commission OIG | 1 |
| Federal Mediation and Conciliation Service | 1 |
| Federal Mine Safety and Health Review Commission | 1 |
| Federal Permitting Improvement Steering Council | 1 |
| Federal Retirement Thrift Investment Board | 1 |
| Federal Trade Commission | 1 |
| Federal Trade Commission OIG | 1 |
| Gulf Coast Ecosystem Restoration Council | 1 |
| Harry S. Truman Scholarship Foundation | 1 |
| Institute of Museum and Library Services | 2 |
| International Joint Commission | 1 |
| International Trade Commission | 1 |
| James Madison Memorial Fellowship Foundation | 1 |
| Japan-US Friendship Commission | 1 |
| Kennedy Center | 1 |
| Marine Mammal Commission | 1 |
| Merit Systems Protection Board | 1 |
| Millenium Challenge Corporation | 1 |
| National Archives and Records Administration | 1 |
| National Capital Planning Commission | 1 |
| National Council on Disability | 1 |
| National Credit Union Administration | 1 |
| National Endowment for the Arts | 1 |
| National Endowment for the Humanities | 1 |
| National Gallery of Art | 1 |
| National Labor Relations Board | 1 |
| National Mediation Board | 1 |
| National Transportation Safety Board | 1 |
| Northern Border Regional Commission | 1 |
| Nuclear Waste Technical Review Board | 1 |
| Occupational Safety and Health Review Commission | 1 |
| Office of Government Ethics | 1 |
| Office of Navajo and Hopi Indian Relocation | 1 |
| Office of the Special Counsel | 1 |
| Peace Corps | 1 |
| Pension Benefit Guaranty Corporation | 1 |
| Permitting Council | 1 |
| Pretrial Services Agency for the District of Columbia | 1 |
| Privacy and Civil Liberties Oversight Board | 1 |

| | |
|---|---|
| Railroad Retirement Board | 1 |
| Railroad Retirement Board OIG | 1 |
| Securities and Exchange Commission and Securities and Exchange Commission OIG (one plan with both) | 1 |
| Selective Service System | 1 |
| Smithsonian Institution | 1 |
| Social Security Advisory Board | 1 |
| Southeast Crescent Regional Commission | 1 |
| Southwest Border Regional Commission | 1 |
| Surface Transportation Board | 1 |
| Tennessee Valley Authority | 2 |
| The Wilson Center | 1 |
| U.S. African Development Foundation | 1 |
| U.S. Agency for Global Media | 1 |
| U.S. Arctic Research Commission | 1 |
| U.S. Commission on Civil Rights | 1 |
| U.S. Holocaust Memorial Museum | 1 |
| U.S. Interagency Council on Homelessness | 1 |
| U.S. International Boundary and Water Commission | 1 |
| U.S. International Development Finance Corporation | 1 |
| U.S. International Development Finance Corporation OIG | 1 |
| U.S. Trade and Development Agency | 1 |
| **TOTAL** | **147** |