UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRACY FORWARD FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF PERSONNEL MANAGEMENT, et al.,<br><br>Defendants. | Civil Action No. 25-0858 (SLS) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................... ii

ARGUMENT

I. Defendants Properly Withheld the ARRPs Under Exemption 5 ............................ 1

A. Plaintiff Has Not Shown That the ARRPs Were Postdecisional or Subsequently Adopted .................................................. 1

B. Subsequent Implementation Does Not Eliminate the Foreseeable Harm from Disclosing the ARRPs......................................... 7

C. Plaintiff Has Not Undermined Defendants' Determination That the ARRPs Contain No Reasonably Segregable Information ........................................................................................ 12

II. OPM Properly Withheld Portions of the Communications Under Exemption 5 ......................................................................................... 15

A. The Senior Advisor's Subsequent Approval Did Not Strip the March 3 Email of Exemption 5 Protection ........................................ 15

B. Plaintiff Has Not Identified Any Additional Reasonably Segregable Information in the ARRP Spreadsheet.................................. 19

CONCLUSION.......................................................................................................... 22

# TABLE OF AUTHORITIES


**Cases** **Page**

*Abtew v. Dep't of Homeland Sec.*,
808 F.3d 895 (D.C. Cir. 2015) ........ 17

*Access Reports v. Dep't of Just.*,
926 F.2d 1192 (D.C. Cir. 1991) ........ 8, 18

*Afshar v. Dep't of State*,
702 F.2d 1125 (D.C. Cir. 1983) ........ 5

*Ancient Coin Collectors Guild v. Dep't of State*,
641 F.3d 504 (D.C. Cir. 2011) ........ 12, 21

*Boyd v. Crim. Div. of the U.S. Dep't of Just.*,
475 F.3d 381 (D.C. Cir. 2007) ........ 11

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*,
161 F. Supp. 3d 120 (D.D.C. 2016) ........ 6

*Ctr. for Immigr. Stud. v. U.S. Citizenship & Immigr. Servs.*,
766 F. Supp. 3d 1 (D.D.C. 2025) ........ 11

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ........ 16

*Elec. Frontier Found. v. Dep't of Just.*,
739 F.3d 1 (D.C. Cir. 2014) ........ 12

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
384 F. Supp. 2d 100 (D.D.C. 2005) ........ 5, 17

*Emuwa v. Dep't of Homeland Sec.*,
113 F.4th 1009 (D.C. Cir. 2024) ........ 8

*Fed. Open Mkt. Comm. v. Merrill*,
443 U.S. 340 (1979) ........ 5, 17

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
71 F.4th 1051 (D.C. Cir. 2023) ........ 15, 22

*Johnson v. Dist. of Columbia*,
49 F. Supp. 3d 115 (D.D.C. 2014) ........ 21

*Jud. Watch of Fla., Inc. v. Dep't of Just.*,
102 F. Supp. 2d 6 (D.D.C. 2000) .................................................. 5, 17

*Jud. Watch, Inc. v. Dep't of Def.*,
245 F. Supp. 3d 19 (D.D.C. 2017) .................................................. 15

*Khatchadourian v. Def. Intel. Agency*,
597 F. Supp. 3d 96 (D.D.C. 2022) .................................................. 13

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004) .................................................. 10

*Lead Indus. Ass'n v. OSHA*,
610 F.2d 70 (2d Cir. 1979) .................................................. 20

*Leopold v. CIA*,
835 F. Supp. 3d 138 (D.D.C. 2026) .................................................. 19

*Levinthal v. Fed. Elec. Comm'n*,
219 F. Supp. 3d 1 (D.D.C. 2016) .................................................. 22

*Machado Amadis v. Dep't of State*,
971 F.3d 364 (D.C. Cir. 2020) .................................................. 5, 7, 16, 17

*Mapother v. Dep't of Just.*,
3 F.3d 1533 (D.C. Cir. 1993) .................................................. 12, 13, 21

*Mingo v. Dep't of Just.*,
793 F. Supp. 2d 447 (D.D.C. 2011) .................................................. 3

*Mobley v. CIA*,
924 F. Supp. 2d 24 (D.D.C. 2013) .................................................. 6, 14

*New York v. McMahon*,
826 F. Supp. 3d 184 (D. Mass. 2026) .................................................. 2

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
57 F.4th 1061 (D.C. Cir. 2023) .................................................. 15

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
421 U.S. 168 (1975) .................................................. 17

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) .................................................. 8, 9, 10, 18

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ........ 11

*Schoenman v. FBI*,
Civ. A. No. 04-2202 (CKK), 2009 U.S. Dist. LEXIS 22060 (D.D.C. Mar. 19, 2009) ........ 20

*Shapiro v. Dep't of Just.*,
239 F. Supp. 3d 100 (D.D.C. 2017) ........ 19

*Wannall v. Honeywell Int'l, Inc.*,
775 F.3d 425 (D.C. Cir. 2014) ........ 21

*Wolfe v. Dep't of Health & Hum. Servs.*,
839 F.2d 768 (D.C. Cir. 1988) ........ 12

**<u>Statutes, Regulations, Rules, and Other Authorities</u>**

5 U.S.C. § 552 ........ 10

By and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), Defendants Office of Personnel Management ("OPM") and Office of Management and Budget ("OMB") respectfully submit this combined reply in further support of their motion for summary judgment ("Def. Mot.," ECF No. 43), and opposition to Plaintiff's cross-motion for summary judgment ("Pl. Mot.," ECF No. 44). As explained in further detail below, the Court should deny Plaintiff's cross-motion for summary judgment, grant Defendants' motion for summary judgment, and enter judgment as a matter of law in Defendants' favor.

## ARGUMENT

### I. <u>Defendants Properly Withheld the ARRPs Under Exemption 5.</u>

Plaintiff has not shown that the Phase 1 Agency Reduction-in-Force and Reorganization Plans ("ARRPs") reflected final agency decisions when prepared or later lost their privileged character. Nor does Plaintiff undermine Defendants' showing that disclosure would foreseeably harm future deliberations and that no reasonably segregable information has been withheld.

#### A. Plaintiff Has Not Shown That the ARRPs Were Postdecisional or Subsequently Adopted.

Plaintiff advances three arguments for why the ARRPs, or portions thereof, were not predecisional: that workforce actions occurring before or shortly after the submission deadline establish that some ARRPs reflected final decisions; that subsequent workforce actions allegedly implemented proposals contained in the ARRPs and thereby constituted adoption of those documents; and that the February 26 Memorandum required agencies to report actions already undertaken. *See* Pl. Mot. at 11, 15 & n.5, 17–19. None establishes that the withheld ARRPs memorialized final agency decisions or subsequently lost their predecisional character.

Plaintiff's first argument mistakes temporal proximity for evidence that the ARRPs themselves memorialized final decisions. Its theory rests on two different inferences depending

on when the cited workforce action occurred, and neither establishes that the withheld ARRPs were "wholly post-decisional." Pl. Mot. at 17.

For agencies that announced or initiated workforce reductions before the ARRP submission deadline, Plaintiff generally treats that deadline as a proxy for the date on which the ARRP was prepared. Thus, because HHS initiated workforce reductions "two days before its ARRP was due," Plaintiff concludes that the ARRP "reflected decisions the agency already made." Pl. Mot. at 18. But the fact that a reduction was announced before an ARRP was due does not establish that the ARRP itself was prepared only after the relevant decision had been made. The chronology necessary to Plaintiff's argument—final decision first, preparation of the ARRP second—does not follow from the submission deadline. Plaintiff cites no evidence establishing otherwise.

Plaintiff's principal example, the Department of Education, suffers from the same problem as well as a more fundamental one. Plaintiff relies on an Administrative Procedure Act case, *New York v. McMahon*, 826 F. Supp. 3d 184, 197–98 (D. Mass. 2026), where the court, in assessing the adequacy of the administrative record, interpreted the information before it as indicating that the Department of Education's ARRP was created after the Department had decided to implement its workforce reduction. Pl. Mot. at 18. But in response to extra-record discovery in that case, the Department of Education subsequently denied, in response to a request for admission in *McMahon*, that it ever submitted an ARRP to Defendants. *See New York v. McMahon*, Civ. A. No. 25-10601 (D. Mass.), ECF No. 224-6 at 5. Thus, *McMahon* cannot establish that any ARRP at issue here was prepared after the relevant agency had already made the decisions supposedly reflected in it.

Plaintiff's inference as to agencies that undertook workforce actions after the submission deadline is weaker still. Plaintiff points to subsequent actions by CFPB, IRS, Interior, and other agencies and asserts that the timing "suggests" the ARRPs "broadly reflected decisions already

made and policies the agencies adopted." Pl. Mot. at 18–19. But suggestion is all Plaintiff offers. It identifies no evidence establishing when those agencies actually made the cited decisions, or even that the later workforce actions were among the proposals contained in their withheld ARRPs. The fact that an agency undertook workforce actions after submitting its ARRP does not establish when the underlying decisions were made; those decisions could just as readily have followed, rather than preceded, the ARRP's preparation. Plaintiff's speculation thus does not controvert Defendants' evidence concerning the role the ARRPs played in the decision-making process or create a genuine dispute of material fact sufficient to defeat summary judgment. *See Mingo v. Dep't of Just.*, 793 F. Supp. 2d 447, 452 (D.D.C. 2011) ("An agency's declarations are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims.").

Nor does Plaintiff's reliance on *American Federation of Government Employees v. Trump* bridge that gap. There, the court reviewed a sample of four ARRPs *in camera* and stated that those particular records were "likely" not predecisional and deliberative, based in part on representations that certain workforce reductions were already in progress but had been forestalled by an injunction. Pl. Mot. at 19. Plaintiff itself only "presume[s]" that those same plans are among the records withheld here. *Id.* Whatever persuasive force that assessment may have as to the particular documents reviewed there, it does not establish the status of the remaining ARRPs, much less support Plaintiff's broader inference that workforce actions undertaken after submission must have reflected decisions already made when the ARRPs were prepared.

The publicly available National Endowment for the Humanities ("NEH") ARRP is similarly specific to that agency: its statement that NEH "will begin to implement Phase 1 of its ARRP immediately" establishes what that particular plan said, not that the withheld ARRPs generally memorialized preexisting final decisions. *See* Pl. Mot. at 19. And the fact that only four

agencies submitted more than one version of a Phase 1 ARRP likewise says little about whether the submitted plans were predecisional. *See id*. The relevant inquiry concerns a document's function in the decision-making process, not whether multiple versions of it happened to exist.

More fundamentally, Plaintiff's evidence does not support the categorical conclusion its argument advertises. Plaintiff begins by asserting that "at least some" ARRPs were "wholly post-decisional," but then characterizes its evidence as showing only that the ARRPs reflected, "at least in part," final decisions by some submitting agencies. Pl. Mot. at 17–18. Those propositions are not equivalent. Even if Plaintiff could establish that a particular ARRP referred to one action the submitting agency had already decided to undertake, that would not establish that the ARRP as a whole memorialized settled policy rather than also containing preliminary recommendations, assessments, alternatives, and proposed courses of action concerning matters that remained subject to agency, OPM, and OMB review. As Defendants have shown, the Phase 1 ARRPs formed part of a broader two-phase planning process in which agencies proposed approaches concerning staffing, organizational structure, consolidation, resource allocation, and workforce reductions for further review, feedback, and refinement. Plaintiff's timing-based inferences therefore do not undermine Defendants' showing that the withheld ARRPs were predecisional and deliberative.

Plaintiff's second argument fares no better. Plaintiff assumes that agencies "in fact" carried out proposals contained in their ARRPs and reasons that the ARRPs were therefore "subsequently adopted and lost their predecisional character." Pl. Mot. at 15 & n.5. But Plaintiff identifies no evidence establishing that the later workforce actions it cites were, in fact, the actions proposed in the withheld ARRPs. Instead, Plaintiff simply assumes the contents of the very records it seeks to compel Defendants to disclose and then relies on that assumption to challenge their withholding. That kind of circular reasoning does not suffice to create a genuine dispute of material fact.

In any event, even if an agency ultimately took the same action recommended in an ARRP, that would not strip the document of its predecisional character. *See Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 (1979) (holding that, because Exemption 5 is intended to protect free flow of advice, the issuance of a decision does not remove need for protection); *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 112–13 (D.D.C. 2005) ("Contrary to plaintiff's assertion that materials lose their Exemption 5 protection once a final decision is taken, it is the document's role in the agency's decision-making process that controls."); *Jud. Watch of Fla., Inc. v. Dep't of Just.*, 102 F. Supp. 2d 6, 16 (D.D.C. 2000) (rejecting as "unpersuasive" the contention that the privilege ceases to apply once deliberations have ended and a decision has been made). Nor does an agency's subsequent implementation of a recommendation, standing alone, establish that the agency adopted the document's reasoning as its own. *See Machado Amadis v. Dep't of State*, 971 F.3d 364, 370–71 (D.C. Cir. 2020); *Afshar v. Dep't of State*, 702 F.2d 1125, 1143 n.22 (D.C. Cir. 1983). Plaintiff therefore wrongly conflates an agency's later action with adoption of the antecedent deliberative analysis that may have preceded it.

Plaintiff's third argument also fails. Plaintiff contends that the February 26 Memorandum required agencies to include information in their Phase 1 ARRPs concerning workforce-reduction steps "already implemented" or "already undertaken," and argues that such material therefore cannot be predecisional or deliberative. Pl. Mot. at 11. But that overreads the Memorandum. Plaintiff appears to rely principally on the Memorandum's identification of "[a]ttrition achieved by RIFs" as one of the workforce-reduction tools agencies could employ. *Id.* Read in context, however, that phrase does not refer exclusively—or even principally—to workforce reductions already completed before submission of the Phase 1 ARRPs. The Memorandum instead asked agencies to identify the workforce tools they "intend[] to use," the competitive areas and

components they "ha[ve] targeted or will target" for initial workforce reductions, their "target" for FTE reductions, and their "timetable and plan for implementing" their Phase 1 ARRPs. *See* Harris Decl. Ex. 1 at 3–4. Plaintiff itself recognizes the forward-looking nature of those provisions, describing them as "[a]gencies' plans for future action" and, indeed, as "the only arguably deliberative material," in Plaintiff's view. Pl. Mot. at 10. Plaintiff therefore cannot isolate the phrase "[a]ttrition achieved by RIFs" from the forward-looking framework in which it appears and treat it as proof that the ARRPs necessarily memorialized completed workforce actions.

Appendix 1, which the Memorandum expressly cross-references for the "specific steps and timing" applicable to reductions in force, confirms the forward-looking nature of that process. Harris Decl. Ex. 1 at at 4. As of the March 13 Phase 1 deadline, only the first step—identifying competitive areas and levels and determining which positions "may be affected"—was required to have occurred. The Appendix then contemplated up to thirty additional days of planning, preparation, and analysis; the preparation and issuance of RIF notices; a notice period; and, only as the "Final Step," "RIF Implementation & Separation." *Id.* at 7. Although the Memorandum contemplated that RIF effective dates could predate submission of an ARRP, *see id.* at 3, it did not require agencies generally to report completed workforce reductions, as Plaintiff suggests.[1]

---

[1] To the extent Plaintiff relies on the Department of Energy's publicly released ARRP to suggest that other agencies likewise included information concerning actions already undertaken, that inference is speculative. *See* Pl.'s Mot. at 11–12. Although the Department of Energy was among the agencies whose ARRPs Defendants reviewed, its submission establishes only what that agency included in its own ARRP and does not establish that the withheld ARRPs contain comparable material. As the Harris Declaration explains, the contents of the ARRPs varied according to the mission and structure of the submitting agency. *See* Harris Decl. ¶ 29 & Ex. 2. Plaintiff thus again assumes the contents of the very records it seeks to compel Defendants to disclose and then relies on that assumption to challenge their withholding. Nor would an inconsistency concerning one submission, even if established, necessarily undermine the Harris Declaration as a whole. *See Mobley v. CIA*, 924 F. Supp. 2d 24, 63 (D.D.C. 2013); *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 136 (D.D.C. 2016).

### B. Subsequent Implementation Does Not Eliminate the Foreseeable Harm from Disclosing the ARRPs.

Plaintiff's foreseeable-harm argument rests first on the same unsupported factual premise discussed above. Plaintiff asserts that agencies "in fact carried out" elements of their ARRPs and that disclosure of those supposedly implemented proposals therefore could cause no harm. Pl. Mot. at 15. But Plaintiff identifies no evidence establishing that the later workforce actions it cites were, in fact, the actions proposed in the withheld ARRPs. Instead, it reasons from the timing of subsequent agency actions that there are "almost certainly numerous elements" of the ARRPs that were later implemented. *Id.* That speculation about the contents of the withheld records does not establish the premise on which Plaintiff's foreseeable-harm argument depends.

In any event, even if some recommendations contained in the ARRPs were ultimately implemented, Plaintiff is wrong that implementation eliminates any reasonably foreseeable harm from disclosure. The relevant harm is not limited to interference with the particular deliberation that produced the records; it includes the chilling effect that disclosure of completed deliberations would have on comparable deliberations going forward.

*Machado Amadis* illustrates the point. There, the agency used "Blitz Forms" to adjudicate administrative FOIA appeals: line attorneys identified and analyzed the issues presented by an appeal and made recommendations to senior attorneys, who reviewed the form before finally deciding the appeal. *See Machado Amadis*, 971 F.3d at 370. By the time the records were sought, the forms had already served that deliberative function in completed appeals. Nevertheless, the D.C. Circuit held both that the recommendations remained predecisional and deliberative notwithstanding the ensuing final decisions and that the agency had established foreseeable harm because disclosure would discourage line attorneys from candidly discussing their "ideas, strategies, and recommendations," thereby impairing the forthright internal discussions necessary

to adjudicate future appeals. *Id*. at 370–71. Thus, the fact that a deliberative recommendation has already culminated in agency action does not eliminate the prospective harm that disclosure may cause to similar deliberations in the future. *See also Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1015–17 (D.C. Cir. 2024) (reaffirming that the relevant inquiry is whether disclosure of the particular material would chill candid advice in future agency deliberations).

Plaintiff's contrary theory would make the protection afforded candid recommendations turn retrospectively on whether a decisionmaker ultimately happened to accept and implement them. That approach is difficult to reconcile with *Access Reports v. Department of Justice*, 926 F.2d 1192 (D.C. Cir. 1991). There, the court rejected a rule under which the privilege would depend on whether a deliberative process ultimately produced an identifiable agency decision because, "[a]t the time of writing[,] the author could not know whether the decisionmaking process would lead to a clear decision . . . or fizzle." *Id*. at 1196. Conditioning protection on that later event would induce officials to hedge their analysis and write more cautiously in the first instance. *See id*. The same logic applies here. Officials preparing ARRPs could not know when formulating their preliminary recommendations whether those recommendations would ultimately be accepted, modified, rejected, or abandoned. A rule under which disclosure becomes harmless whenever a recommendation is later implemented would therefore make the treatment of the original deliberative material depend on an outcome the author could not know when preparing it—and would predictably encourage the very self-censorship that the privilege is intended to prevent.

Nor can Plaintiff glean support from *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021). Plaintiff emphasizes the court's statement that an agency must explain how disclosure would "actually impede those same agency deliberations going forward." Pl. Mot. at 15 (quoting *Reps. Comm.*, 3 F.4th at 370). But the court was not requiring an agency

to show that disclosure would disrupt the continuation of the particular deliberation that generated the records. Indeed, in explaining what a sufficient foreseeable-harm showing looks like, the court cited *Machado Amadis* as an example because the agency there specifically connected disclosure to chilling the candid internal discussions necessary for the adjudication of administrative appeals. *See Reps. Comm.*, 3 F.4th at 370–71. The court then framed the deficiency in the FBI's showing as its failure to explain "whether and how" disclosure "would harm similar deliberations in the future." *Id.* at 372. Thus, the foreseeable-harm inquiry asks whether disclosure of the particular deliberative material would impair comparable agency decision-making going forward—not whether the specific deliberation reflected in the record remains ongoing.

Defendants have made precisely the concrete showing that the statute requires. The Harris Declaration explains that disclosure would reveal agencies' preliminary proposals, projections, estimates, recommendations, and the assumptions underlying them concerning matters that remained unresolved when the ARRPs were prepared. *See* Harris Decl. ¶ 31. Because those recommendations concern matters directly affecting agency components, employees, unions, contractors, congressional stakeholders, and program beneficiaries, officials would reasonably expect disclosure to generate scrutiny, opposition, and pressure directed at particular options and those who proposed or evaluated them. *See id.* ¶ 32. That prospect would predictably alter participation in similar deliberations: agencies would be more likely to temper candid assessments, avoid identifying sensitive deficiencies or unpopular alternatives, omit potentially controversial options, or frame recommendations for an outside audience rather than provide OPM and OMB with their most forthright analysis. *See id*. The resulting loss of candor would, in turn, impair OPM's and OMB's ability to test assumptions, identify weaknesses, compare alternatives, reconcile competing priorities, and formulate coherent recommendations. *See id*. ¶ 33.

The Harris Declaration also identifies a separate harm from disclosure while proposals remain under consideration: tentative proposals or assumptions could be mistaken for final agency or Administration decisions, prompting personnel departures, operational disruption, lobbying, litigation, and other external pressures that could, in turn, constrain available options and distort the decision-making process before review is complete. *See* Harris Decl. ¶ 34. And Harris explains why these harms are especially acute here, given that the ARRPs concern particularly sensitive matters of organizational restructuring, workforce management, resource allocation, statutory responsibilities, and budget planning. *See id.* ¶ 35. Plaintiff's characterization of this showing as a few "brief and generalized statements" that "simply assert" harm, *see* Pl. Mot. at 15–16, disregards the Declaration's detailed explanation of what information disclosure would reveal, how affected officials and stakeholders would predictably react, how those reactions would alter agency behavior, and how that altered behavior would concretely impair OPM's and OMB's decision-making. *See* Harris Decl. ¶¶ 31–36.

Plaintiff's proposed rule would also extend the foreseeable-harm requirement beyond the function Congress assigned it. True, Congress added that requirement to impose a meaningful, independent check on the use of FOIA exemptions, with particular concern about overuse of the deliberative-process privilege. *See Reps. Comm.*, 3 F.4th at 369. But Congress did not make the privilege categorically unavailable whenever a deliberative recommendation was later implemented. To the contrary, when Congress wished to impose a categorical limitation on the deliberative-process privilege in the same legislation, it did so expressly, providing that the privilege does not apply to records twenty-five years old or older. *See* 5 U.S.C. § 552(b)(5). Plaintiff's theory would effectively add a second categorical limitation—one tied to subsequent implementation—that Congress did not enact. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004)

(declining to "read an absent word into [a] statute" and thereby enlarge its scope). The foreseeable-harm requirement calls for a concrete, context-specific showing of harm; it does not itself create an automatic exception whenever deliberations culminate in agency action.

Finally, there is no merit to Plaintiff's reliance on Defendants' preliminary-injunction briefing. Plaintiff notes that, before OMB had completed processing the ARRPs, the Walsh Declaration expressed OMB's expectation that the plans would be protected by the deliberative-process privilege, and that Defendants later referred to that position in the parties' July 30, 2025 joint status report when they reported OMB's determination that the ARRPs remained exempt. *See* Pl. Mot. at 16–17. From that reference, Plaintiff speculates that "whether any review was undertaken at all, much less a 'line-by-line' review," is open to serious question. *Id.* at 17. But the fact that OMB's later determination referred back to its earlier legal position does not establish that OMB or OPM simply adopted that prediction without reviewing the records; still less does it contradict the Harris Declaration's sworn representation that OPM conducted a line-by-line review of the Phase 1 ARRPs. *See* Harris Decl. ¶ 40. The July 30 joint status report did not purport to describe the entirety of the review ultimately undertaken, and Plaintiff identifies no evidence that the review described by Harris did not occur. Its contrary inference is therefore precisely the kind of speculation that cannot overcome an agency declaration submitted in support of summary judgment. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Indeed, "[w]hen an agency conducts such a line-by-line review, it is 'entitled to a presumption that it complied with its obligation' to release segregable material." *Ctr. for Immigr. Stud. v. U.S. Citizenship & Immigr. Servs.*, 766 F. Supp. 3d 1, 12 (D.D.C. 2025) (quoting *Boyd v. Crim. Div. of the U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007)) (cleaned up).

**C. Plaintiff Has Not Undermined Defendants' Determination That the ARRPs Contain No Reasonably Segregable Information.**

Plaintiff's segregability argument fails for two independent reasons. First, the factual material identified by Plaintiff is itself deliberative because its selection, organization, and presentation reflected the agencies' evaluative judgments. Second, even assuming some factual material is nonexempt, OPM determined that such material was inextricably intertwined with privileged content and could not meaningfully be segregated and released.

As to the first, Plaintiff treats the presence of factual information within the ARRPs as establishing that such material is necessarily non-deliberative and subject to disclosure. *See* Pl. Mot. at 9–14. But the distinction between "fact" and "opinion" is not dispositive under the deliberative-process privilege. Factual material may itself be protected where its selection, organization, or presentation would reveal an agency's deliberative judgments. *See Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 13 (D.C. Cir. 2014) (recognizing that factual material may be protected where its disclosure "would so expose the deliberative process") (quoting *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)); *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (recognizing that "the selection or organization of facts" may reflect "an exercise of discretion and judgment calls"); *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (holding factual material deliberative where it was "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents" for use in discretionary decision-making).

That is precisely what OPM determined after reviewing the ARRPs line-by-line. The Harris Declaration explains that agencies' selection, organization, emphasis, and presentation of factual information—including staffing data, resource information, organizational characteristics, and historical facts—reflected evaluative judgments about what each agency considered

significant in developing its proposed approach to reorganization. *See* Harris Decl. ¶¶ 37–40. Disclosure of that material would therefore reveal aspects of the agencies' deliberative analysis rather than disclose facts standing apart from that analysis.

Moreover, the factual material within the ARRPs did not merely inform the submitting agencies' own deliberations. The ARRPs were submitted to OPM and OMB for use in evaluating the agencies' proposed reorganizations, including their consistency with statutory requirements, budgetary constraints, applicable personnel regulations, and broader Administration objectives, and to facilitate further interagency review and coordination. *See* Harris Decl. ¶¶ 8, 10–11, 30, 33; *cf. Khatchadourian v. Def. Intel. Agency*, 597 F. Supp. 3d 96, 116 (D.D.C. 2022) (upholding Exemption 5 withholdings that included requests for further information from interagency partners regarding an ongoing interagency review process). Thus, the factual information presented by the submitting agencies also served as an input into Defendants' own deliberative process.

Plaintiff's attempt to distinguish *Mapother* does not establish otherwise. Plaintiff reasons that, because the February 26 Memorandum directed agencies to provide information concerning certain subjects, agencies exercised no judgment in compiling their responses and merely followed OPM's and OMB's instructions. *See* Pl. Mot. at 13–14. But identifying general categories of requested information did not dictate which facts an agency would select within those categories, the level of detail it would provide, how it would characterize or emphasize that information, or how it would present those facts in relation to its proposed restructuring. The existence of common subject headings therefore does not transform every factual statement made in response into the sort of neutral compilation that *Mapother* found segregable on the ground that it "reflect[ed] no point of view." *Mapother*, 3 F.3d at 1540.

Nor do the ARRPs of the Department of Energy and the National Endowment for the Humanities establish that factual material within the withheld ARRPs is segregable. Plaintiff relies on those records to argue that agencies generally "did indeed report" factual information separately from their proposed future actions. Pl. Mot. at 9–11. Although both agencies were among those whose ARRPs Defendants reviewed, those records establish only how those particular agencies chose to structure their submissions, not whether the information within those sections is legally segregable. Indeed, as the Harris Declaration explains, the contents of the ARRPs varied according to the mission and structure of the submitting agency. *See* Harris Decl. ¶ 29. And OPM did not base its non-segregability determination on the structure of some generic or representative ARRP; it conducted a line-by-line review of the withheld ARRPs themselves. *See id.* ¶ 40. Plaintiff therefore cannot extrapolate from the format of two publicly released submissions to establish that comparable information in other withheld ARRPs can likewise be separated from the deliberative judgments reflected in its selection and presentation. Nor does the existence of separately organized factual information in those two submissions, without more, undermine the Harris Declaration's assessment of the withheld ARRPs as a whole. *See Mobley*, 924 F. Supp. 2d at 63 (rejecting an attempt to discredit an agency declaration based on an isolated inconsistency).

Lastly, Plaintiff does not meaningfully confront Defendants' alternative segregability showing. Even assuming that some factual information within the ARRPs could be characterized as nonexempt, OPM determined after its line-by-line review that such information was inextricably intertwined with the surrounding recommendations, evaluations, and other deliberative material. *See* Harris Decl. ¶¶ 37–40. Extracting that material would require extensive line-by-line redactions and leave largely isolated words, phrases, data points, or fragments whose meaning and significance derive from the surrounding deliberative context and which, standing alone, would

have little informational value. *See id.* Plaintiff invokes the general rule requiring release of reasonably segregable information, *see* Pl. Mot. at 8–14, but does not address this record-specific determination or explain how the fragments identified by OPM could be meaningfully released without revealing the deliberative context from which they derive. The D.C. Circuit has upheld precisely this kind of segregability determination. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 71 F.4th 1051, 1057–58 (D.C. Cir. 2023) (upholding withholding where further segregation would yield only "partial sentences or single sentences" that were "entirely meaningless" without surrounding exempt material); *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1069 (D.C. Cir. 2023) (affirming withholding where the remaining material would have "minimal or no information content"); *see also Jud. Watch, Inc. v. Dep't of Def.*, 245 F. Supp. 3d 19, 37 (D.D.C. 2017) (upholding withholding after line-by-line review where "arguably non-deliberative" factual material was inextricably intertwined with deliberative content).

Plaintiff thus has not rebutted OPM's determination that no reasonably segregable information can be released from the withheld ARRPs.

## II. <u>OPM Properly Withheld Portions of the Communications Under Exemption 5.</u>

Plaintiff's remaining arguments concern a March 3, 2025 email containing subordinate recommendations and a spreadsheet prepared to assist the interagency review of ARRPs. Neither challenge warrants disclosure. The subsequent approval of the recommendations did not eliminate their protection, and Plaintiff has not established that the spreadsheet contains additional reasonably segregable information.

### A. The Senior Advisor's Subsequent Approval Did Not Strip the March 3 Email of Exemption 5 Protection.

The document at issue is an email sent on March 3, 2025, at 4:00 p.m., from OPM employees to OPM's Senior Advisor to the Director concerning the review and development of

advice to other federal agencies regarding their workforce restructuring plans. *See* Harris Decl. ¶ 57. In the redacted portion, OPM employees discussed issues arising during OPM's consideration of those plans and the guidance to be provided to the affected agencies. *See id.*

Plaintiff begins by asserting generally that OPM is "mistaken" that the challenged communications are predecisional and deliberative but does not separately develop that contention with respect to the March 3 email. Pl. Mot. at 20. Instead, its challenge rests principally on the Senior Advisor's response that he "Agree[d] with these responses." *Id.* at 20–21. From that statement, Plaintiff infers that the redacted proposed responses were "apparently the final guidance" approved for dissemination, reflected OPM's policy, and therefore could be disclosed without foreseeable harm. *Id.* at 21. Plaintiff also claims that OPM has not provided a sufficient explanation regarding segregability. *See id.* None of these arguments warrants disclosure.

At the outset, Plaintiff has not shown that the withheld material was anything other than predecisional and deliberative when it was created. The withheld material is not the Senior Advisor's response; it is the antecedent communication from subordinate employees proposing responses for his review. That material was created before OPM had finalized the guidance it would provide and was submitted upward for further review, potential revision, or restructuring. *See* Harris Decl. ¶¶ 58–59. It thus reflects the type of subordinate-to-superior recommendations that "lie at the core of the deliberative-process privilege." *Machado Amadis*, 971 F.3d at 370 (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001)).

Nor does the Senior Advisor's subsequent statement that he "Agree[d] with these responses" establish that the antecedent recommendations lost that protection. "To the contrary, the Supreme Court has held that the deliberative-process privilege protects recommendations that are approved or disapproved without explanation." *Machado Amadis*, 971 F.3d at 370–71 (citing

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 185 (1975)). Thus, although the Senior Advisor's terse statement may establish that he approved the recommendations presented to him, it does not, without more, demonstrate that OPM adopted the subordinate employees' underlying reasoning as its own. *See Abtew v. Dep't of Homeland Sec.*, 808 F.3d 895, 899 (D.C. Cir. 2015) (holding that a supervisor's initialing of a recommendation did not necessarily indicate adoption or approval of all of the memorandum's reasoning).

Plaintiff also has not established that the redacted recommendations themselves subsequently became OPM's final guidance. Nothing Plaintiff cites shows that the redacted language was transmitted unchanged to the affected agencies, incorporated into final guidance, or otherwise expressly adopted by OPM as its reasoning or policy. Indeed, Plaintiff itself states only that the responses were "apparently" the final guidance approved for dissemination. Pl. Mot. at 21. That qualified assertion is insufficient to establish adoption of the withheld material.

Furthermore, even if OPM subsequently issued guidance consistent with the recommendations contained in the email, that later action would not itself strip the antecedent communication of its predecisional character. *See Fed. Open Mkt. Comm.*, 443 U.S. at 360; *Elec. Priv. Info. Ctr.*, 384 F. Supp. 2d at 112–13; *Jud. Watch of Fla., Inc.*, 102 F. Supp. 2d at 16. Plaintiff's argument therefore conflates three distinct concepts: approval of a recommendation, adoption of the reasoning underlying that recommendation, and subsequent agency action consistent with it. The Senior Advisor's response directly establishes only the first.

Plaintiff fares no better in arguing that disclosure of the withheld material would cause no foreseeable harm. Even assuming that the Senior Advisor's response constituted final approval of the proposed responses, foreseeable harm does not disappear merely because a decisionmaker ultimately accepts a subordinate's recommendation. *See Machado Amadis*, 971 F.3d at 370–71.

Indeed, *Machado Amadis* upheld withholding of precisely this type of material—recommendations prepared by subordinate attorneys for senior-level review—even after the senior attorneys had made the decisions to which those recommendations related. *See id.* The relevant question is whether disclosure of the antecedent deliberative exchange would chill comparable candid advice in the future, not whether the particular deliberation has since concluded.

Plaintiff's reliance on *Reporters Committee* does not alter that conclusion. *See* Pl. Mot. at 21. As explained above, *Reporters Committee* does not require an agency to show that the particular deliberation reflected in a record remains ongoing; the inquiry is whether disclosure would impair the same or similar deliberations going forward. *See Reps. Comm.*, 3 F.4th at 370–72. Plaintiff's contrary theory would also make protection of subordinate recommendations turn retrospectively on whether the decisionmaker ultimately accepted them—the same type of outcome-dependent rule that *Access Reports* rejected because an official cannot know, when providing candid advice, what decision will ultimately follow. *See Access Reports*, 926 F.2d at 1196. Nor did Congress transform the foreseeable-harm requirement into a categorical exception whenever deliberative advice ultimately contributes to agency action. *See* Section I(B), *supra*.

The Harris Declaration makes the required context-specific showing here. It explains that disclosure would reveal OPM employees' internal discussions, questions, analyses, tentative interpretations, recommendations, and draft responses developed before final guidance was issued. *See* Harris Decl. ¶ 60. Employees who know that such preliminary advice will later be publicly disclosed would foreseeably hesitate to identify problems candidly or commit tentative views to writing and might instead raise such matters orally or not at all, degrading both the quality and the record of OPM's decision-making. *See id.* That prospective chilling harm exists regardless of whether the Senior Advisor ultimately approved the recommendations presented by subordinates.

Finally, Plaintiff's segregability challenge is entirely conclusory. Plaintiff asserts only that OPM has not provided the required "detailed justification" for its segregability determination. Pl. Mot. at 21. But the Harris Declaration explains that OPM conducted a line-by-line review of the challenged communications to determine whether factual material could be meaningfully separated from deliberative content. *See* Harris Decl. ¶¶ 65–68. OPM determined that the withheld material either consists of deliberative content—including candid assessments, recommendations, opinions, questions, and preliminary evaluations—or contains factual material so inextricably intertwined with that content that it could not be released without revealing the substance of OPM's deliberations. *See id*. Plaintiff identifies no particular information within the redacted portion that could be meaningfully segregated and released and offers no basis to question OPM's record-specific determination. Its bare assertion therefore does not undermine OPM's showing that no reasonably segregable information has been withheld.

**B. Plaintiff Has Not Identified Any Additional Reasonably Segregable Information in the ARRP Spreadsheet.**

Plaintiff's challenge to OPM's withholding of the ARRP Phase 1 Plan Summary Data spreadsheet ("ARRP Phase 1 Plan Summary Data 3.18.xlsx") rests on the narrow assertion that certain factual entries can be segregated and released.[2] Specifically, Plaintiff relies on the Harris Declaration's description of the spreadsheet as a snapshot of the ARRPs "submitted to date" to argue that OPM should be required to release "factual information like the agency name or the

---

2 Plaintiff's memorandum does not otherwise dispute that the spreadsheet was predecisional and deliberative, or that disclosure would cause foreseeable harm; its sole challenge concerns the segregability of certain factual information. In fact, Plaintiff expressly abandoned its challenge to these issues in its response to Defendants' Statement of Undisputed Material Facts. In response to each of Defendants' factual statements concerning that record, Plaintiff stated: "No longer a material fact as Plaintiff no longer challenges Defendants' withholding for this record." Pl.'s Resp. SUMF ¶¶ 115–32, ECF No. 44-3. That express representation removes the withholding from the matters the Court must resolve on summary judgment. *See Leopold v. CIA*, 835 F. Supp. 3d 138, 152 (D.D.C. 2026); *Shapiro v. Dep't of Just.*, 239 F. Supp. 3d 100, 106 n.1 (D.D.C. 2017).

date when the ARRP was submitted." *See* Pl. Mot. at 21–22. According to Plaintiff, "[t]he fact that OPM collected such information on a given date would not tend to reveal any deliberations, because Defendants had publicly required agencies to submit the ARRPs." *Id*. at 22.

But Plaintiff's argument concerning submission dates misconstrues the Harris Declaration. The declaration describes the spreadsheet as a snapshot of the ARRPs "submitted to date," meaning those that had been received as of March 18, 2025, when the spreadsheet was prepared. *See* Harris Decl. ¶ 61. That is an entirely different proposition from Plaintiff's suggestion that the spreadsheet contains information about the date on which each agency submitted its ARRP. The declaration makes no such representation, and Plaintiff improperly conflates the two concepts. Plaintiff's observation that the mere collection of information on a particular date would not reveal any deliberations thus rests on a mistaken premise: Plaintiff seeks to compel disclosure of information that Defendants never represented the spreadsheet contained.

Nor is there any merit to Plaintiff's contention that OPM should be required to segregate and release the names of agencies that submitted Phase 1 ARRPs. Defendants have already disclosed the identities of agencies that submitted those ARRPs by the March 13 deadline in Exhibit 2 to the Harris Declaration, entitled "Agency ARRP Phase 1 Submissions (March 13, 2025)." Plaintiff does not explain what additional nonexempt information would be gained by requiring OPM to extract and release agency names that have already been disclosed in Exhibit 2. *See Schoenman v. FBI*, Civ. A. No. 04-2202 (CKK), 2009 U.S. Dist. LEXIS 22060, at *87 (D.D.C. Mar. 19, 2009) (declining to require segregation and release of identifying information and dates already provided to the requester); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 86 (2d Cir. 1979) (declining to require disclosure of factual material already appearing in the public record).

Further, to the extent Plaintiff's reference to the spreadsheet's "factual and numerical entries" can be construed as a broader challenge to the withholding of other factual information, that argument fares no better. Plaintiff ignores the Harris Declaration's explanation that those entries appeared alongside reviewers' summaries, annotations, and follow-up notes, and that the selection, organization, and characterization of the information reflected judgments about which aspects of the agencies' submissions warranted attention. *See* Harris Decl. ¶ 61. Plaintiff does not address that explanation and thus fails to rebut Defendants' central justification for treating the spreadsheet's factual content as deliberative. *See Wannall v. Honeywell Int'l, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014); *Johnson v. Dist. of Columbia*, 49 F. Supp. 3d 115, 121–22 (D.D.C. 2014).

In any event, such a challenge fails on the merits. Even ostensibly factual information may itself be protected by the deliberative-process privilege where its selection, organization, or presentation reflects the agency's evaluative judgments. *See Ancient Coin Collectors Guild*, 641 F.3d at 513; *Mapother*, 3 F.3d at 1539. Here, the spreadsheet was not a neutral database compiled for recordkeeping purposes; it was an interim tool prepared to assist officials in evaluating the submitted ARRPs. *See* Harris Decl. ¶¶ 61–62. Its factual and numerical entries reflected the reviewers' judgments about which aspects of the agencies' proposed plans warranted attention, and disclosure of those entries would therefore reveal aspects of the agencies' deliberative process rather than merely disclosing factual information standing apart from that process. *See id.*

Finally, Plaintiff's assertion that OPM "fails to acknowledge that certain cells of the spreadsheet can be segregated and released," Pl. Mot. at 22, does not overcome Defendants' separate, alternative segregability showing. OPM expressly considered whether factual material could be meaningfully separated from deliberative content and determined, following a line-by-line review, that the withheld material either was itself deliberative or, to the extent it was

otherwise nonexempt, was inextricably intertwined with the reviewers' assessments, annotations, and other deliberative information. *See* Harris Decl. ¶¶ 65–68. Plaintiff's assertion assumes, without establishing, that particular cells contain wholly nonexempt information capable of being segregated and released. But the mere fact that information is organized into discrete spreadsheet cells does not establish that the contents of any particular cell are exclusively nonexempt or that those contents can be separated from the surrounding deliberative context without revealing the reviewers' judgments. Plaintiff thus mistakes the physical organization of a spreadsheet it has never seen for the legal segregability of its contents, without meaningfully confronting OPM's determination that no additional nonexempt information could be released. *See Flyers Rts.*, 71 F.4th at 1057–58; *Levinthal v. Fed. Elec. Comm'n*, 219 F. Supp. 3d 1, 9–10 (D.D.C. 2016).

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's cross-motion for summary judgment, grant Defendants' motion for summary judgment, and enter judgment as a matter of law in Defendants' favor on all claims.

Dated: October 26, 2026
Washington, D.C.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ Benjamin H. Zieman
Benjamin H. Zieman
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530
202-252-2540
benjamin.zieman@usdoj.gov

*Attorneys for the United States of America*